UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

NAPOLEON ANDREWS,

          Plaintiff,

     v.

PRIDE INDUSTRIES and JEAN ZURBUCHEN,

          Defendants.

No.  2:14-cv-02154-KJM-AC

ORDER

From May 2009 until November 2012, Napoleon Andrews worked for PRIDE Industries, leading a crew of disabled employees at Travis Air Force Base (AFB) in Fairfield, California.  Starting in May 2012, Mr. Andrews went on leave under the Family and Medical Leave Act (FMLA), taking an extended absence he attributed to stress and anxiety stemming from racial and disability discrimination in the workplace.  Near the end of his FMLA leave, Mr. Andrews was terminated.  In September 2014, Mr. Andrews filed this suit against PRIDE and his supervisor there, Jean Zurbuchen, alleging a variety of violations, including racial and disability discrimination, retaliation, harassment, and wrongful termination.  After the close of discovery, both defendants have moved for summary judgment.

/////

/////

1

1    At hearing on defendants' motion, Andrea Rosa appeared for Mr. Andrews, and

2    David Daniels and Jennifer Calderon Schmuldt appeared for PRIDE and Ms. Zurbuchen.  ECF

3    No. 86.  As explained below, defendants' motion is GRANTED in PART and DENIED in PART.

4    I.    PROCEDURAL HISTORY

5    Mr. Andrews originally filed this action against PRIDE and Ms. Zurbuchen on

6    September 16, 2014 in the Solano County Superior Court.  First Am. Compl. (FAC), ECF No. 3.

7    He asserted the following six claims: (1) disability discrimination and failure to accommodate;

8    (2) failure to engage in the interactive process; (3) race discrimination; (4) hostile work

9    environment; (5) failure to prevent discrimination; and (6) wrongful termination in violation of

10   public policy.  FAC at ¶¶ 72–125.  With the exception of Mr. Andrews' common law wrongful

11   termination claim, all claims alleged violations of the California Fair Employment Housing Act

12   (FEHA).  *See id.*  Defendants then removed the case to this court, contending the federal enclave

13   doctrine, discussed in more detail below, establishes federal jurisdiction.  Not. Remov. 2, ECF

14   No. 2.  After removal, defendants filed a motion to dismiss.  ECF No. 6.

15        A.    Motion to Dismiss First Amended Complaint

16   In their motion to dismiss, defendants argued the federal enclave doctrine

17   precluded Mr. Andrews' state-law claims.  *Id.* at 5–7.  Essentially, defendants argued the conduct

18   giving rise to Mr. Andrews' claims occurred on Travis AFB, a federal enclave, and any attempt to

19   subject such conduct to state regulation was precluded.  *Id.*

20   Defendants did not prevail on this theory because it was unclear whether David

21   Grant Medical Center, a later-acquired unit at Travis AFB where the alleged discrimination and

22   retaliation took place, was a federal enclave not subject to state regulation.  Order on MTD (Prev.

23   Order) 7–8, ECF No. 18.  In denying defendants' motion to dismiss, the court allowed

24   Mr. Andrews the opportunity to conduct discovery on the federal enclave issue, as well as leave

25   to file a second amended complaint.  *Id.* at 9.

26        B.    Second Amended Complaint

27   Mr. Andrews' second amended complaint asserts the same state-law claims as his

28   first amended complaint, but further asserts the following federal claims: (1) race discrimination

2

1    in violation of 42 U.S.C. § 1981; (2) retaliation also in violation of § 1981; (3) discriminatory

2    termination in violation of the FMLA; and (4) retaliation also for exercising the right to FMLA

3    leave.  *See generally* Second Am. Compl.  (SAC), ECF No. 25.  Mr. Andrews' suit is grounded

4    on federal question and supplemental jurisdiction.  28 U.S.C. §§ 1331, 1367.

5         Defendants now move for summary judgment.  Mot., ECF No. 65.  Mr. Andrews

6    opposes the motion, Opp'n, ECF  No. 80, and defendants have replied, Reply, ECF No. 81.

7    II.     FACTUAL BACKGROUND

8         The following facts are undisputed unless otherwise stated.  Where a genuine

9    dispute exists, the court draws reasonable inferences in favor of Mr. Andrews.  *Tolan v. Cotton*,

10   ___U.S.___, 134 S. Ct. 1861, 1868 (2014) (per curiam).

11        A.     PRIDE Hires Mr. Andrews

12        PRIDE Industries is a federal contractor; it services Travis AFB.  Undisputed

13   Material Fact (UMF) No. 1, ECF No. 80-5; Prev. Order at 7.  Napoleon Andrews was hired as

14   Grounds Maintenance Lead in May 2009, and was responsible for leading a crew of employees

15   with disabilities in landscaping duties.  UMF No. 3.  He also was responsible for maintaining the

16   grounds of buildings on the base, cutting grass with lawn mowers, and trimming hedges.  Walters

17   Decl. ¶ 11, ECF No. 70.  Jean Zurbuchen was the Manager of Grounds Maintenance at PRIDE,

18   and Mr. Andrews' supervisor.  Walters Decl. ¶ 8.

19        Mr. Andrews is African-American and speaks fluent Spanish.  Andrews Decl. ¶ 2,

20   ECF No. 80-2; Andrews Dep. 440:25–441:6.

21        B.     May 2010 to May 2012: Disciplinary Write-ups

22        Soon after Mr. Andrews started work at PRIDE, he began to receive a series of

23   disciplinary write-ups.  Walters Decl. ¶¶ 16–20; Ex. C.  For example, in May 2010, Mr. Andrews

24   was sanctioned for "failure to follow instructions" when he did not complete paperwork after

25   mowing around two buildings on the base.  Walters Decl. Ex. C at 22.  On August 13, 2010,

26   Mr. Andrews received a written warning for arriving at work fifteen minutes late.  *Id.*  On

27   July 15, 2011, Mr. Andrews received a document titled "final written warning" for a "safety

28   violation," due to driving a PRIDE truck with its tailgates unsecured.  *Id.*  Despite receiving a

1 "final warning," Mr. Andrews continued to work for PRIDE.  On August 8, 2011, Mr. Andrews

2 was disciplined for unnecessarily spraying an area for weeds.  *Id.*  On February 22, 2012,

3 Mr. Andrews received another "final written warning" for failure to follow instructions and poor

4 work performance, because he did not report that work under his supervision was "incomplete."

5 *Id.*  Again, Mr. Andrews was allowed to continue working.  While the record does not make clear

6 who delivered the disciplinary write-ups to Andrews, Ms. Zurbuchen signed the written warnings.

7 *See id.* at 26–36.

8          During the same time period Mr. Andrews received these write-ups, PRIDE also

9 gave Mr. Andrews performance reviews.  *Id.* 37–39.  According to a June 2010 performance

10 review, Mr. Andrews was rated as "meeting expectations" in the following areas: (1) team player

11 and presenting a positive, courteous attitude toward all employees; and (2) providing customer

12 service through demonstrative courtesy and respect towards customers.  *Id.*  Mr. Andrews met

13 expectations but needed improvement or training in attendance, job knowledge, initiative, and

14 quality or quantity of work.  *Id.*  The performance review further noted Mr. Andrews was a

15 positive lead, "but needs to show his guys that he can be a leader and get them to work the way he

16 wants them to."  *Id.*  Mr. Andrews received the same ratings in his June 2011 performance

17 review, except the review noted Mr. Andrews "needs to work with his crew on all times even

18 when spraying or working on paper work."  *Id.*

19          His disciplinary write-ups notwithstanding, Mr. Andrews was neither demoted nor

20 was his pay decreased.  *Id.* ¶ 13.  During a morning roll call at Travis AFB on April 30, 2012,

21 however, PRIDE management publicly announced Mr. Andrews would be reassigned from his

22 Grounds Maintenance Lead position to a lower-level detail position.  Andrews Decl. ¶ 17, ECF

23 No. 80–2.  Ms. Zurbuchen was partially responsible for this decision, as it was part of her

24 responsibility to decide where to assign Ground Maintenance Leads.  *Id.*; Walters Decl. Ex. C.

25 Although the lower-level detail position did not involve a pay cut, Mr. Andrews would lead fewer

26 employees and would be subject to daily assignment changes.  Andrews Decl. ¶ 17.  He

27 initially told he would be in this position for one week, but the position was later extended to two

28 weeks.  *Id.*  Before the two weeks ended, Mr. Andrews went out on leave, as described below.

4

1         C.     <u>May 2009 to May 2012: Discriminatory Treatment</u>

2         Also during the same time period he received disciplinary write-ups, Mr. Andrews

3    witnessed and personally experienced discriminatory treatment.  Andrews Dep. 443:2–14.  For

4    example, when a Caucasian co-worker ruptured a main water line to a building Andrews

5    described as "one of the most important buildings" at the AFB, PRIDE supervisors commented,

6    "Oh, wasn't that cute, [the coworker] hit that pipe?"  *Id.* 443:2–14.  When another Caucasian co-

7    worker was insubordinate with a union representative, the co-worker did not receive a write-up,

8    and no disciplinary action was taken.  *Id.* 447:24–448:15.  The record does not make clear

9    whether these co-workers had a disability, as some PRIDE employees do.  Mr. Andrews, by

10   contrast, received several citations for offenses he deems less serious, as noted above.

11        Mr. Andrews also witnessed and experienced treatment by Ms. Zurbuchen that he

12   considered unfair.  In particular, Mr. Andrews alleges Ms. Zurbuchen forbid him from speaking

13   Spanish in the workplace, and often referred to his Mexican coworkers as "the Mexican Mafia."

14   Rosa Decl. ¶ 18, Exhibit Q, ECF No. 80–1; Andrews Dep. 49:5–8, 50:10–13.  In his declaration,

15   Mr. Andrews stated because many of his co-workers were Spanish monolingual speakers, it was

16   important for him to speak and write Spanish so he could help his crew or other laborers

17   understand what was being asked of them.  Andrews Decl. ¶ 6.  Because many PRIDE

18   supervisors and managers did not speak Spanish, very few people other than Mr. Andrews could

19   assist his co-workers.  *Id.*  However, other evidence in the record suggests speaking Spanish in

20   the workplace was allowed, and the prohibition on speaking Spanish was acceptable only "under

21   limited circumstances," such as speaking to a manager who only speaks English or in an

22   emergency situation.  Rosa Decl. Ex. Q at 145.

23        Ms. Zurbuchen also called Mr. Andrews "slow," on numerous occasions, and at

24   least once threatened to terminate Mr. Andrews by showing him pictures of minorities who had

25   been fired or wrongfully terminated at PRIDE while telling him, "You could be in this group."

26   Andrews Dep. 49:8, 49:22–50:4.  Ms. Zurbuchen also uttered the word "nigger" in front of Mr.

27   Andrews, in the context of asking whether Mr. Andrews himself used that word at work.

28

1    Andrews Dep. 49:8–10.  At his deposition, Mr. Andrews testified Ms. Zurbuchen's comments

2    caused him to feel intimidated and to lose concentration while at work.  Andrews Dep. 48:6–22.

3         D.    May 7, 2012: Leave from PRIDE

4              As mentioned, the discriminatory treatment he witnessed and experienced caused

5    Mr. Andrews "memory loss, anxiety, and [an] inability to concentrate."  Andrews Dep. 45:24–

6    46:1.  In particular, Mr. Andrews had difficulty concentrating on his job without seeming anxious

7    or fidgety or having to leave work for short periods of time.  Andrews Dep. 46:19–47:4.  On May

8    7, 2012, he went on leave from his job at PRIDE under the FMLA.  Andrews Dep. 227:14–

9    228:18; Walters Decl. ¶¶ 28–29.  Mr. Andrews made numerous requests to extend his leave,

10   reviewed below.  UMF Nos. 37, 39.

11        E.    Requests for Extended FMLA Leave

12             In support of his initial request for FMLA leave, Mr. Andrews' primary doctor

13   Dr. Tuan Doan, gave Mr. Andrews a medical note, dated May 7, 2012, stating "unable to work

14   since May 7, 2012, due to medical illness, return back to work on May 21, 2012," which

15   Dr. Doan submitted to PRIDE.  UMF No. 33; Walters Decl. ¶¶ 25, 28.  The parties dispute

16   whether PRIDE actually received Dr. Doan's note.  *Compare* Walters Decl. ¶¶ 25, 28, *with*

17   Andrews Decl. ¶ 19.  On the one hand, Mr. Andrews avers Dr. Doan faxed the note to PRIDE on

18   May 7, 2012, Mr. Andrews' first day of FMLA leave.  Andrews Decl. ¶ 19.  On the other hand,

19   PRIDE says it did not receive the May 7 note, but instead, received an different note on May 16,

20   2012 requesting leave until August 4, 2012.  Walters Decl. ¶ 25.  PRIDE avers that from May 8,

21   the day after Mr. Andrews went on leave, until May 15, 2012, PRIDE received no communication

22   from Mr. Andrews.  Walters Decl. ¶ 28.  In any event, PRIDE cites to evidence showing that on

23   May 16, 2012, it granted Mr. Andrews' request for leave, and extended his leave from July 31 to

24   August 4, 2012.  *Id.*

25        F.    Second Request for Extended Leave

26             The same day PRIDE granted Mr. Andrews' request for extended FMLA leave, it

27   also requested that Mr. Andrews complete and return paperwork.  Walters Decl. ¶ 29.

28   Mr. Andrews did not return the paperwork to PRIDE.  Walters Decl. ¶ 30.   However,

1    Mr. Andrews submitted a new medical note from Dr. Doan, dated July 25, 2012, in support of

2    extending his medical leave from August 4, 2012 to November 4, 2012.  UMF No. 39.  Before

3    granting this request, PRIDE ordered Mr. Andrews to obtain answers from Dr. Doan to a

4    reasonable accommodations questionnaire by August 16, 2012.  UMF No. 40.

5            Dr. Doan completed the questionnaire on August 6, 2012, but PRIDE did not

6    receive it until August 27, 2012.  UMF No. 42.  In the questionnaire, Dr. Doan noted

7    Mr. Andrews had stress disorder, generalized anxiety disorder, as well as a latex allergy.  Walters

8    Decl. Ex. J at 59–66.  These conditions affected at least four major life activities including

9    breathing, working, concentrating, and interacting with others.  *Id.*  Dr. Doan also noted the

10    medication for Mr. Andrews' conditions would prevent him from operating heavy machinery, and

11    this restriction was expected to last until October 30, 2012.  *Id.*

12            PRIDE interpreted the questionnaire to mean Mr. Andrews would be able to return

13    to work after October 30, 2012, and issued a letter granting Mr. Andrews' request to extend his

14    leave to that date.  Walters Decl. Ex. K.  Specifically, it granted Mr. Andrews' second request in

15    an October 2, 2012 letter, which stated in part,

16
17
18
19
> If you are able to return to work on October 31, 2012, you must
> provide [a] note from your doctor that clears you to return to work
> and that lists any and all restrictions.  Please contact your Local HR
> Representative, Andre Anthony at [phone number provided] by
> October 23, 2012 to either provide the return to work note and to
> arrange for your return to work, or to resign your position.

20    *Id.*  The parties dispute whether October 23 was a hard deadline or a due date contingent on

21    whether Mr. Andrews was able to return to work on October 31, 2012.  *Compare* Walters Decl.

22    ¶ 35 *with* Andrews Decl. ¶ 35.  PRIDE argues the letter clearly required Mr. Andrews to contact

23    Andre Anthony by October 23, 2012.  Walters Decl.  ¶ 35.  Mr. Andrews argues the letter

24    required him to contact Andre Anthony by October 23, 2012 only if he was able to return to work

25    by October 31, 2012.  Andrews Decl. ¶ 35.  Mr. Andrews understood he did not have to respond

26    to PRIDE because he was unable to return to work by October 31.  *Id.*  Regardless, Mr. Andrews

27    neither returned the paperwork nor indicated a desire to resign his position by October 23, 2012.

28    Walters Decl. ¶ 37.

1       G.       Third Request and Termination

2              On October 22, 2012, PRIDE received another medical note from Dr. Doan, dated

3   October 16, 2012, requesting a third extension of leave for Mr. Andrews to adjust his

4   medications, and stating that Mr. Andrews could return to work on November 16, 2012.  Walters

5   Decl. ¶ 36; Ex. L.  PRIDE did not hear anything more from Mr. Andrews until November 15,

6   2012, when he sent a letter stating he was not resigning from his job, he appreciated the time

7   allotted to him, and he needed more leave to have a new reasonable accommodation questionnaire

8   completed.  Walters Decl. Ex. N.

9              On the morning of November 16, 2012, Mr. Andrews did not show up for work.

10  Walters Decl. ¶ 39.  Mr. Andrews arrived instead in the afternoon to hand-deliver a note from

11  Dr. Doan, dated  November 16, 2012, requesting additional leave.  Andrews Decl. ¶ 30.  In his

12  declaration, Mr. Andrews notes Dr. Doan was not available to sign the letter that day, so he first

13  hand-delivered the unsigned note to PRIDE, and then waited until Monday, November 19, to get

14  a copy of the note signed.  *Id.*  When he arrived at PRIDE on November 16, Mr. Andrews met

15  with Donna Walters, the head of HR, and said he was ready to work that day.  *Id.*  Ms. Walters

16  told him to wait for a letter PRIDE had been working on, which Mr. Andrews later discovered

17  was a termination letter.  *Id.*

18             On November 19, 2012, the same day PRIDE received the signed medical note

19  from Dr. Doan, Walters Decl. ¶ 40, PRIDE issued a termination letter to Mr. Andrews for "his

20  failure to follow instructions and provide return to work documentation by October 23, 2012, and

21  for his failure to return to work on November 16–19, 2012."  Walters Decl.  ¶ 42 & Ex. M.

22             In making the decision to terminate Mr. Andrews, Ms. Walters consulted with

23  PRIDE's HR representative Andre Anthony, the person responsible for corresponding with

24  Mr. Andrews throughout his FMLA leave.  Anthony Dep. 107:12–13.  Mr. Anthony testified that

25  he told Ms. Walters he did not receive any information from Mr. Andrews by the requested due

26  date of October 23, 2012.  *Id.*  He also testified he did not know whether Mr. Andrews' doctor

27  had made contact with HR, Anthony Dep. 107:18–21, or whether Mr. Andrews contacted anyone

28  besides himself, *id.* 107:14–17.

8

1          H.        Complaints against PRIDE

2                    During his time on FMLA leave, Mr. Andrews filed several claims and complaints

3    against PRIDE.  He filed a workers' compensation claim on May 31, 2012, alleging work-related

4    injuries, including "on the job stress."  Andrews Decl. Ex. C.  He filed a claim with the National

5    Labor Relations Board on June 17, 2012, stating he was disciplined and harassed for his union

6    activity.  Andrews Decl. Ex. B.  During his deposition, Mr. Andrews testified he engaged in

7    union activity related to interrupted meal and rest breaks, without clarifying what kind of activity.

8    Andrews Dep. 215:9–24.  He also filed a complaint with the California Department of Pesticide

9    Regulation on August 23, 2012, for pesticide exposure during his time at PRIDE.  Andrews Dep.

10   169:15–16, 176:22–177:4.

11                   Mr. Andrews also filed two administrative claims with the California Department

12   of Fair Employment and Housing (DFEH).  Daniels Decl. ¶ 7, ECF No. 68.  In his first complaint,

13   filed June 25, 2012, Mr. Andrews alleged that between July 2011 and May 2012 he was subjected

14   to differential treatment because of his age and race.  Daniels Decl. Ex. B.  PRIDE responded to

15   the first complaint in a letter to the DFEH, stating Mr. Andrews' claims were "not accurate," and

16   enclosed copies of his write-ups to support its position.  Walters Ex. C.  Mr. Andrews received

17   two right-to-sue letters for his first DFEH complaint, on April 17 and April 22, 2013.  Daniels

18   Decl. Ex. C.

19                   In his second complaint, filed February 4, 2014, Mr. Andrews alleged

20   discrimination, harassment, and retaliation based on Mr. Andrews' membership in a protected

21   class, disability, national origin, and race.  Daniels Decl. Ex. D.[1]  Although the second DFEH

22

23   _____
            [1] The court notes Mr. Andrews' deposition testimony raises a doubt whether he filed this
24   complaint with the DFEH or whether his lawyer, Ms. Andrea Rosa, signed and filed the
     complaint without Mr. Andrews' notice or consent.  *See* Andrews Dep. 415:9 (when asked about
25   the second DFEH complaint during his deposition, Mr. Andrews stated he did not recall filing it),
     415:19 (Mr. Andrews did not recognize complaint or right to sue letter that followed the
26   complaint), 416:11–13 (when asked how he was discriminated against on August 30, 2013,
     Mr. Andrews said, "I don't know what they're referring to when they say August 30, 2013."),
27   416:23–25 (when specifically asked if he was discriminated against on August 30, 2013,
     Mr. Andrews said, "I know I was fired in November of 2012.").

28

1    complaint alleged only that the discrimination occurred on or before August 30, 2013, without

2    more, the parties agree Mr. Andrews' claims for disability discrimination under FEHA accrued, at

3    the latest, by November 19, 2012, the date Mr. Andrews' termination became effective.  UMF

4    No. 25.  Mr. Andrews received a right-to-sue letter for his second DFEH complaint later on

5    February 4, 2014; the same day he had filed the second DFEH complaint.  Daniels Decl. Ex. D.

6    III.        LEGAL STANDARD

7            A court will grant summary judgment "if . . . there is no genuine dispute as to any

8    material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

9    The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

10   resolved only by a finder of fact because they may reasonably be resolved in favor of either

11   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

12           Rule 56 also authorizes granting summary judgment on only part of a claim or

13   defense, known as partial summary judgment.  *See* Fed. R. Civ. P. 56(a) ("A party may move for

14   summary judgment, identifying each claim or defense—or the part of each claim or defense—on

15   which summary judgment is sought.").  The standard that applies to a motion for partial summary

16   judgment is the same as that which applies to a motion for summary judgment.  *See State of Cal.*

17   *ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998)

18   (applying summary judgment standard to motion for summary adjudication); *ARC of Cal. v.*

19   *Douglas*, No. 11–02545, 2015 WL 631426, at *3 (E.D. Cal. Feb. 13, 2015).

20           The moving party bears the initial burden of showing the district court "there is an

21   absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S.

22   317, 325 (1986).  The burden then shifts to the nonmoving party, which "must establish that there

23   is a genuine issue of material fact . . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

24   U.S. 574, 585 (1986).  In carrying their burdens, both parties must "cit[e] to particular parts of

25   materials in the record . . . or show [] that the materials cited do not establish the absence or

26   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

27   support the fact."  Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The

28   nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

10

1    material facts."). Moreover, "the requirement is that there be no genuine issue of material fact . . .

2    Only disputes over facts that might affect the outcome of the suit under the governing law will

3    properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48. A district

4    court is "not required to comb the record to find some reason to deny a motion for summary

5    judgment." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal

6    quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to

7    find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587

8    (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

9    IV.     DISCUSSION

10          A.     Absence of Written Opposition

11          Defendants PRIDE and Ms. Zurbuchen move for summary judgment on each of

12   Mr. Andrews' claims. At the outset, the court notes Mr. Andrews' opposition does not address

13   several arguments defendants make in support of their motion, including the claims of FEHA

14   hostile work environment, § 1981 race discrimination, retaliation in violation of the FMLA, and

15   termination in violation of the FMLA. *See generally* Opp'n. Mr. Andrews' counsel, Ms. Rosa,

16   stated at hearing that she was not abandoning any claims, but represented she did not respond to

17   some of defendants' arguments because her original opposition was erased electronically within

18   hours before the court's filing deadline. With her original opposition having disappeared, counsel

19   explained she scrambled to assemble a decent, working opposition before the filing deadline and

20   haphazardly neglected to address a number of issues.

21          Counsel did not alert the court or defendants to this mishap until she was asked

22   about it at the hearing. At that point she asked the court to allow leave to attach a table of

23   contents to her opposition brief. The court denied this request. Counsel did not request leave to

24   clarify or supplement the substance of her filed opposition, so the court takes the opposition as it

25   finds it. Nevertheless, the court takes care to consider the merits of plaintiff's position rather than

26   construing counsel's incomplete briefing as partial consent to granting defendants' motion.

27

28

1      B.      State Law Claims

2              1.      Federal Enclave Doctrine

3              Defendants argue, as they did in their prior motion to dismiss, Mr. Andrews' state

4      law claims are barred because the events in question occurred on a federal enclave.  Mot. at 26.

5              The federal enclave doctrine derives from Article I, section 8, clause 17 of the

6      United States Constitution, which provides Congress shall have the power "to exercise [exclusive

7      legislative] Authority over all Places purchased by the Consent of the Legislature of the State in

8      which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other

9      needful Buildings."  U.S.C.A. Const. art. 1, § 8, cl. 17; *see also Pac. Coast Dairy v. Dep't of*

10     *Agric. of Cal.*, 318 U.S. 285, 294 (1943) (citing U.S.C.A. Const. art. 1, § 8, cl. 17) (holding the

11     state of California was not authorized to regulate the sale of milk sold to war department located

12     on federal enclave).  This essentially means, when the federal government acquires a tract of land

13     or property, jurisdiction over the land rests primarily, if not exclusively, with the United States,

14     and "local law not inconsistent with federal policy [may] remain[] in force until altered by

15     national legislation." *Id.*

16             Here, in its order on defendants' motion to dismiss, the court concluded the land

17     designated as Travis AFB qualified for federal enclave status.  Prev. Order at 7.  But because the

18     events in question occurred at David Grant Medical Center, a later-acquired tract either on or near

19     Travis AFB, the court noted it could not say at that point whether defendants' alleged conduct

20     took place on a federal enclave.  *Id.*  Although the parties have engaged in full discovery, neither

21     party presented new evidence on this issue, and defendants' mere reiteration of their previously

22     unsupported argument does not assist the court or make their case.

23             Defendants' motion for summary judgment on the basis of the federal enclave

24     doctrine is DENIED, and the court proceeds to the merits of Mr. Andrews' state law claims.

25             2.      Disability Discrimination

26             Defendants argue first that they are entitled to summary judgment because

27     Mr. Andrews' disability discrimination claims for failure to accommodate and failure to engage

28     in the interactive process are barred by FEHA's one-year statute of limitations.  Mot. at 13.

1   Mr. Andrews argues the statute of limitations was tolled as a result his pending workers'

2   compensation claim, which he argues addressed the same injuries supporting his discrimination

3   claim, namely on-the-job stress.  Opp'n at 14.

4           FEHA prohibits discrimination in employment on the basis of physical or mental

5   disability.  Cal. Gov't Code § 12940(a); *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514, 1520 (9th Cir.

6   1995) (interpreting FEHA).  The Ninth Circuit has held FEHA provisions relating to disability

7   discrimination are based on the ADA, *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 n.3

8   (9th Cir. 2001), and "stress" can be considered a mental impairment under the ADA, *see Snead v.*

9   *Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1088 (9th Cir. 2001).

10          The statute of limitations for a FEHA action is found in California Government

11   Code section 12960, which provides, "[n]o complaint may be filed after the expiration of one year

12   from the date upon which the alleged unlawful practice or refusal to cooperate occurred . . . ."

13   *Cucuzza v. City of Santa Clara*, 104 Cal. App. 4th 1031, 1040 (2002).  This statute of limitations

14   can be tolled when the plaintiff submits a workers' compensation claim for the same injury that

15   gives rise to the FEHA claim filed with the court.  *See Elkins v. Derby*, 12 Cal. 3d 410, 413

16   (1974).

17          In *Elkins*, the plaintiff filed a timely claim for benefits with the Workmen's

18   Compensation Appeals Board after he was injured while working on the defendants' premises.

19   *Id.* at 411.  The Board's decision became final after the statute of limitations applicable to

20   plaintiff's injury ran and the plaintiff then filed a personal injury tort suit for the same injury that

21   had given rise to his workers' compensation claim.  *Id.*  The California Supreme Court held that

22   the limitations period for the plaintiff's personal injury claim was tolled from the day he filed

23   with the Board to the day the Board's decision became final, noting allowing the newly filed civil

24   complaint to proceed would not frustrate the statute of limitations' primary purpose; to prevent

25   surprise to the defendants.  *Id.* at 413 n.1, 416.  The state Supreme Court thus reversed the

26   superior court's holding that plaintiff's personal injury claim was time-barred.  *Id.* at 420.

27          A California Court of Appeals has since construed the equitable tolling doctrine of

28   *Elkins* narrowly, holding the statute of limitations for a personal injury claim is not tolled when a

13

1  plaintiff pursues a remedy for a wrong related to, but not the same as, the injury underlying a

2  workers' compensation claim. *Aerojet Gen. Corp. v. Superior Court*, 177 Cal. App. 3d 950, 955

3  (1986).  In *Aerojet*, the plaintiff sued his employer for fraudulent concealment of the cause of his

4  injuries, bringing suit after he filed a workers' compensation claim for the injury itself. *Id.* The

5  court held the equitable tolling doctrine did not apply to the plaintiff's fraudulent concealment

6  claim, distinguishing the case from that of *Elkins*. *Id.* at 954–55.  The court held the plaintiff in

7  *Aerojet* sought to challenge a wrong "entirely [different]" from the injury alleged in his workers'

8  compensation claim, thereby stifling defendants' ability to gather evidence necessary to refute the

9  later filed civil claim. *Id.* at 955–56.  The plaintiff's claim was dismissed as time-barred. *Id.* at

10  957.  The Ninth Circuit cited to *Aerojet* as an example of California's longstanding refusal to

11  apply the "equitable tolling doctrine to toll the statute of limitations on a claim for a distinct

12  wrong that was not the basis of the earlier proceeding." *Daviton v. Columbia/HCA Healthcare*

13  *Corp.*, 241 F.3d 1131, 1141 (9th Cir. 2001).  In the end, the Ninth Circuit's conclusion in *Daviton*

14  aligned with *Aerojet*, because it held "the equitable tolling doctrine requires that the same wrong

15  serve as the predicate for the earlier and later proceedings to make sure defendant received proper

16  notice." *Id.*

17          Here, there is no dispute the last day Mr. Andrews' claims for disability

18  discrimination could accrue was November 19, 2012, the date his termination became effective.

19  UMF No. 25.  Further, it is undisputed that Mr. Andrews filed his disability discrimination claim

20  with the DFEH on February 4, 2014, well more than one year after this accrual date and nineteen

21  months after he filed his racial and age discrimination claims in his first complaint made to

22  DFEH.  Daniels Decl. Exs. B, D.  In short, Mr. Andrews' disability discrimination claims are

23  untimely unless the limitations period is tolled for approximately fourteen months, the difference

24  in time between November 19, 2012, the last accrual date, and February 4, 2014, the date he filed

25  his DFEH complaint for disability discrimination.

26          In the operative complaint, Mr. Andrews alleges PRIDE's failure to accommodate

27  his mental disability and failure to engage in the interactive process serve as the basis of his

28  FEHA disability discrimination claims.  *See* SAC ¶¶ 91–108.  Whereas in his workers'

1   compensation claim Mr. Andrews alleged "on the job stress," nowhere in the instant complaint

2   does Mr. Andrews assert a claim based on this injury alone, including, including by saying

3   defendants discriminated against him because of his stress.  *Compare id. with* Andrews Decl. Ex.

4   C.  In his opposition, Mr. Andrews argues only that "defendant[s] had notice of [the claimed]

5   disability, and [] therefore, cannot demonstrate any prejudice" Opp'n at 15.  But because Mr.

6   Andrews does not seek to recover in this civil action for the injury at the heart of his workers'

7   compensation claim, as the plaintiff did in *Elkins*, 12 Cal. 3d at 413, but rather for a "different

8   wrong entirely," as in *Aerojet*, 177 Cal. App. 3d at 955–56, his argument is unavailing.

9   Construing the facts in favor of plaintiff, it is not reasonable to conclude a workers' compensation

10  claim for "on the job stress" would have alerted PRIDE to the possibility of disability

11  discrimination claims for failure to accommodate and failure to engage in the interactive process.

12  The time for filing of Mr. Andrews' disability discrimination claims was not equitably tolled, and

13  Mr. Andrews' claims for disability discrimination due to failure to accommodate and

14  discrimination for failure to engage in the interactive process are therefore dismissed as time-

15  barred.

16          Defendants' motion for summary judgment on this claim is GRANTED.

17          3.      Race Discrimination

18          Defendants contend they are entitled to summary judgment on Mr. Andrews'

19  FEHA race discrimination claim, saying, in essence, a jury could not conclude he was terminated

20  under circumstances suggesting a racially discriminatory motive.  Mot. at 17.

21              a)      Legal Standard

22          FEHA makes it "unlawful for an employer to discharge a person on the basis of

23  race, or otherwise to discriminate against the person in compensation or in terms, conditions or

24  privileges of employment."  *Mixon v. Fair Emp't and Hous. Comm'n*, 192 Cal. App. 3d 1306,

25  1316 (1987).  Where "discharge from employment is the challenged action, the complainant must

26  make an initial showing that plaintiff was discharged from a position for which he was qualified

27  'under circumstances which give rise to an inference of unlawful discrimination.' "  *Id.* at 1318

28  (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  Although the

15

1  claimant "need not prove that racial animus was the sole motivation behind the challenged

2  action," he must nonetheless prove by a preponderance of the evidence that "there was a causal

3  connection between the employee's protected status and the adverse employment decision." *Id.*

4  at 1319.

5           To determine whether discriminatory discharge occurred, the court engages in a

6  three-part analysis.  First, to create a rebuttable presumption that the employer unlawfully

7  discriminated against the employee, a plaintiff must show (1) he belongs to a protected class;

8  (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the

9  protected class were retained in similar jobs.  *Id.* at 1318.  Second, the burden shifts to the

10  defendant employer "to articulate some legitimate, nondiscriminatory reason for the employee's

11  rejection."  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If the

12  defendant employer carries its burden, the court proceeds to the third step, where the plaintiff

13  must demonstrate pretext, that the defendant's "proffered reason was not the true reason for the

14  employment decision."  *Id.*  The plaintiff can carry this burden either "directly by persuading the

15  court that a discriminatory reason more likely motivated the employer, or indirectly by showing

16  that the employer's proffered explanation is unworthy of credence."  *Id.* at 1318–19.

17                b)      Plaintiff's Prima Facie Case

18           Here, as an African-American, Mr. Andrews belongs to a protected class for the

19  purposes of FEHA.  *See McKinney v. Am. Airlines, Inc.*, 641 F. Supp. 2d 962, 972 (C.D. Cal.

20  2009) (interpreting FEHA).  And it is undisputed he ultimately was terminated.  This leaves the

21  second and fourth prongs of the prima facie case analysis.

22           As to the second, Mr. Andrews' job performance, the evidence includes the

23  performance reviews PRIDE gave Mr. Andrews in July 2010 and June 2011, which included

24  several ratings of "meets expectations," one of which noted Mr. Andrews was a "positive lead."

25  Walters Decl. Ex. C at 37–38.  While the reviews also noted room for improvement, they did not

26  characterize his work as unsatisfactory.  *Id.*  From this, a reasonable juror could find Mr.

27  Andrews' work was satisfactory prior to his termination.

28

16

1        Regarding the fourth prong, additional evidence in the record could convince a

2   reasonable juror to conclude others not in the protected class received more favorable treatment

3   than plaintiff, or were retained in similar jobs despite shortcomings.  *See Mixon*, 192 Cal. App. 3d

4   at 1318.  During his deposition, Mr. Andrews testified his Caucasian co-workers were not

5   terminated or reprimanded for serious misconduct, whereas he was continually reprimanded for

6   less severe conduct.  Andrews Dep. 443:2–14.  For example, PRIDE reprimanded Mr. Andrews

7   for coming to work fifteen minutes late and unnecessarily spraying an area for weeds after being

8   instructed not to do so.  Walters Decl. Ex. C.  But Mr. Andrews testified that when a Caucasian

9   co-worker ruptured the main water line to an important building, PRIDE supervisors said  that it

10  was "cute [that the co-worker] hit that pipe."  Andrews Dep. 443:2–14.  Defendants do not

11  dispute PRIDE managers characterized the Caucasian co-worker's conduct as "cute."  Similarly,

12  a reasonable jury might well believe Mr. Andrews was treated differently than another Caucasian

13  co-worker who became insubordinate with a PRIDE union representative but did not receive a

14  write-up or any form of disciplinary action.  Andrews Dep. 447:24–448:15.

15       Mr. Andrews also presents evidence showing his supervisor, Ms. Zurbuchen,

16  subjected him to at least two instances of treatment that could be found discriminatory.  In one

17  instance, she pointed to photos of other minorities PRIDE recently fired, while exclaiming Mr.

18  Andrews could find himself in that group one day.  Andrews Dep. 49:22–50:4.  Mr. Andrews has

19  submitted evidence that on another occasion Ms. Zurbuchen used the loaded word "nigger" in

20  Mr. Andrews' presence.  *Id.* 427:1-25.  While it is not disputed that Ms. Zurbuchen used the word

21  in the context of asking whether Mr. Andrews himself used that word at work, *id.* 49:8–10, a

22  reasonable juror could conclude the mere utterance of this particular word by a supervisor, instead

23  of referring to the racial epithet as "the n-word," could be "highly offensive and demeaning" to an

24  African-American subordinate.  As the Ninth Circuit has observed, "no single act can more

25  quickly alter the conditions of employment and create an abusive working environment than the

26  use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his

27  subordinates."  *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).  Whether this

28

1   instance reflects racial insensitivity, thus making it more likely Mr. Andrews was terminated

2   under conditions suggesting discrimination, is a question best left for a jury to decide.

3          Although there is no direct evidence of Ms. Zurbuchen's making the ultimate

4   decision to fire Mr. Andrews, there is sufficient circumstantial evidence to raise a genuine issue

5   of material fact regarding Ms. Zurbuchen's role in or influence on the PRIDE termination

6   decision.  As the manager of Grounds Maintenance at PRIDE, Ms. Zurbuchen was involved in

7   deciding where to assign Grounds Maintenance Leads such as Mr. Andrews, and was at least

8   partly responsible for reassigning Mr. Andrews to a lower-level detail position in which he would

9   lead fewer employees and be subject to route changes each day.  Andrew Decl. ¶ 17.  Ms.

10  Zurbuchen signed all of Mr. Andrews' disciplinary write-ups, except one time when she was on

11  vacation.  *Id.* Ex. C at 25–37.  All things considered, a reasonable jury could conclude

12  discriminatory animus infected the decision to terminate Mr. Andrews.  *See Metoyer v.*

13  *Chassman*, 504 F.3d 919, 938 (9th Cir. 2007) (plaintiff showed discriminatory animus in

14  employment decision based on circumstantial evidence of discriminatory animus of plaintiff's

15  supervisor).

16         Viewing the evidence in the light most favorable to plaintiff, a reasonable juror

17  could conclude Mr. Andrews has established his prima facie case of racial discrimination.  The

18  burden thus shifts to defendants "to articulate some legitimate, nondiscriminatory reason" for

19  Mr. Andrews' termination.  *Mixon*, 192 Cal. App. 3d at 1318.

20                     c)     Defendant's Nondiscriminatory Reasons

21         Defendants contend Mr. Andrews was terminated because of his failure to follow

22  instructions to communicate with HR representative Andre Anthony by October 23, 2012, as well

23  as his failure to return to work at the expiration of his extended leave of absence.  Mot. at 18.

24  Defendants also contend their ultimate termination decision relied on the repeated disciplinary

25  write-ups Mr. Andrews received throughout his employment.  *Id.*  In a letter sent to the DFEH in

26  response to Mr. Andrews' FEHA race discrimination claim, PRIDE argued Mr. Andrews' race

27  discrimination claim was "not accurate," and enclosed copies of the write-ups to support its

28  position.  Walters Ex. C at 21–37.

1          Defendants have articulated reasons a reasonable jury could find the decision to

2    terminate Mr. Andrews was legitimate and nondiscriminatory.  *See Mixon*, 192 Cal. App. 3d at

3    1306 ("The defendant need not persuade the court that it was actually motivated by the proffered

4    reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

5    discriminated against the plaintiff.").  The court proceeds to the third step of analysis, pretext.

6                              d)      Pretext

7          At the third step, a reasonable jury could conclude defendants' "proffered

8    reason[s] w[ere] not the true reason[s] for the employment decision."  *Id.* at 1318.  As to

9    PRIDE's first reason for termination, regarding Mr. Andrews' failure to communicate with HR

10   representative Andre Anthony by October 23, 2012, as well as his failure to return to work, Mr.

11   Andrews' doctor communicated with PRIDE by October 22 in a letter requesting additional leave

12   to give Mr. Andrews time to adjust his medications.  Walters Decl. ¶ 36 & Ex. L.  Mr. Andrews

13   testified he did show up to work on November 16, the day his extended leave expired, albeit in

14   the afternoon to hand-deliver a note from his doctor requesting still further leave.  Andrews Decl.

15   ¶ 30.  Mr. Andrews also notes he told PRIDE he was ready to start working that day, but Donna

16   Walters in HR told him to wait for a letter PRIDE had been working on, which Mr. Andrews later

17   discovered was the termination letter.  *Id.*

18          On balance, the state of the record is insufficient for the court to conclude

19   defendants can prevail as a matter of law; rather a reasonable jury could conclude PRIDE's

20   proffered reason is "unworthy of credence."  *Mixon*, 192 Cal. App. 3d at 1318–1319.  As to

21   PRIDE's reliance on the disciplinary write-ups, defendants' argument is belied by the

22   performance reviews PRIDE gave Mr. Andrews in the same timeframe of July 2010 and June

23   2011, which included several ratings of "meets expectations," and noted Mr. Andrews was a

24   "positive lead," and did not affect his work assignment in any way.  Walters Decl. Ex. C at 37–

25   38.  Moreover, Mr. Andrews' last disciplinary write-up occurred in February 2012, more than

26   eight months before he was terminated, and aside from the short-term reassignment, Mr. Andrews

27   was never demoted or at actual risk of termination.  *Id.*  Defendants' argument is further belied by

28   the termination letter PRIDE sent to Mr. Andrews, which did not attribute his termination to his

19

1   disciplinary write-ups, but only to his delays in contacting HR representative Andre Anthony

2   regarding his return date.  Walters Decl. Ex. M.

3          Mr. Andrews may be able to establish pretext, if the jury reaches the question.

4   Summary judgment is DENIED on the race discrimination claim.

5                    4.    Hostile Work Environment

6          Harassment in the form of a hostile work environment constitutes unlawful

7   discrimination in violation of FEHA.  *Lyle v. Warner Bros. Television Prod.*, 38 Cal. 4th 264, 279

8   (2006).  Although commonly alleged in connection with sex and gender, a hostile work

9   environment claim also may be based on other protected characteristics, including race.

10  *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003).

11         Because California courts look to Title VII cases to guide their interpretation of

12  FEHA, this court looks to *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002)

13  to determine what showing is required in a hostile environment claim.  *See Brooks v. City of*

14  *San Mateo,* 229 F.3d 917, 923 (9th Cir. 2000) (Title VII and FEHA operate under the same

15  guiding principles).  The *Rene* court held a plaintiff must show the following to prevail on a

16  hostile work environment claim: (1) she was subjected to verbal or physical conduct, (2) the

17  conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the

18  conditions of the plaintiff's employment and create an abusive working environment.  *Id.*  The

19  only question here is whether Mr. Andrews has satisfied the third element.  *See* Mot. at 24.

20         While a "mere utterance of an ethnic or racial epithet which engenders offensive

21  feelings in an employee" will not, by itself, establish a case, a plaintiff can overcome a motion for

22  summary judgment when the employer has "created a working environment heavily charged with

23  ethnic or racial insult and ridicule."  *Etter v. Veriflo Corp.*, 67 Cal. App. 4th 457, 463 (1998).  The

24  plaintiff need not show explicitly racialized conduct, for calling someone names of a different sort

25  can serve as a proxy for race and ethnicity.  *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir.

26  2005) (interpreting § 1981 and Title VII).  In *El-Hakem*, for example, the Ninth Circuit held

27  triable issues of fact precluded summary judgment when the plaintiff's employer repeatedly

28  insisted on calling the plaintiff  "Manny" instead of by his Arabic name, despite the plaintiff's

1   strenuous objections.  *Id.* at 1071.  Physical conduct also can support a hostile environment claim.

2   In *Manatt v. Bank of America*, for example, the Ninth Circuit held the plaintiff was subject to a

3   hostile environment where her co-workers ridiculed her not only for mispronouncing "Lima," but

4   also pulled their eyes back in mocking imitation of her appearance and Asian heritage.  339 F.3d

5   792, 794–95, 798 (9th Cir. 2003) (interpreting § 1981 and Title VII).

6            Here, defendants argue Mr. Andrews was not subject to conditions "so severe or

7   pervasive" as to alter his work environment.  Mot. at 24.  Mr. Andrews, in opposition, points to

8   evidence suggesting he witnessed and was himself subject to treatment that referenced race or

9   national origin, which included Ms. Zurbuchen's prohibition on speaking Spanish in which he

10   was fluent, calling plaintiff "slow," threatening him with termination similar to another group of

11   minorities that had been fired, and referring to his co-workers as the "Mexican Mafia."  Rosa

12   Decl. ¶ 18; Andrews Dep. 49:5–8, 50:10–13.  Mr. Andrews also points to the evidence reviewed

13   above suggesting he was treated differently from Caucasian co-workers whose job performance

14   was problematic.

15            On the record before the court no reasonable juror could conclude Mr. Andrews

16   was subjected to racial discrimination when being called "slow," without more.  Mr. Andrews

17   does not argue Ms. Zurbuchen referred to him as slow because of his race, and no precedent or

18   sister court suggests the word "slow" is a proxy for race.

19            On whether the prohibition on Mr. Andrew's ability to speak Spanish can support

20   a hostile environment claim, the Ninth Circuit has addressed bilingualism in the context of a Title

21   VII hostile environment claim.  *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993).

22   The Ninth Circuit has observed that prohibitions on employees who speak both Spanish and

23   English are not so adverse as to amount to a hostile environment claim when bilingual speakers

24   wish to speak one language, such as Spanish, as a matter of "individual preference" rather than

25   necessity, as Title VII "does not protect the ability of workers to express their cultural heritage at

26   the workplace."  *Id.* at 1486–87.

27            But the facts of *Garcia* are distinguishable from those here, for a reasonable juror

28   could find Mr. Andrews' decision to speak with monolingual members of his service crews was

21

1   made out of "necessity" rather than "individual preference," *id*,  because evidence of record

2   suggests other employees, including  PRIDE managers and supervisors, could not effectively

3   communicate the tasks of the job to these crew members.  Andrews Decl. ¶ 6.  Under these

4   circumstances, a reasonable juror could find the prohibition on speaking Spanish in this case not

5   only interfered with Mr. Andrews' practical necessity to communicate, but also amounted to

6   racial discrimination against Mr. Andrews' monolingual Spanish speaking co-workers, which

7   itself in turn interfered with Mr. Andrews' "personal right to work in an environment unaffected

8   by racial discrimination."  *Cf. id.* at 1488 (monolingual Spanish-speaking plaintiff could sustain

9   Title VII discrimination claim if she cannot enjoy the privilege of conversing on the job if

10   conversation is limited to a language she cannot speak); *see also Smithberg v. Merico*, Inc.,

11   575 F. Supp. 80, 83 (C.D. Cal. 1983) (White plaintiff could assert discrimination claim against

12   employer based on alleged practice of discrimination against African Americans; citing *United*

13   *States E.E.O.C. v. T.I.M.E.–D.C. Freight, Inc.*, 659 F.2d 690, 691–92 (5th Cir.1981)).  Similarly,

14   Mr. Andrews could sustain a hostile environment claim based on Ms. Zurbuchen's repeated

15   references to Mr. Andrews' co-workers as the "Mexican Mafia," for a juror could reasonably

16   conclude this conduct also interfered with Mr. Andrews' "personal right to work in an

17   environment unaffected by racial discrimination."  *Smithberg*, 575 F. Supp. at 83.

18            On balance, the prohibition on Mr. Andrews' ability to speak Spanish and Ms.

19   Zurbuchen's  repeated references to Mr. Andrews' co-workers as the "Mexican Mafia," when

20   combined with the threat of termination linked to previously terminated minority workers, could

21   support a hostile environment claim.  When considering the duration of the alleged discriminatory

22   conduct, Mr. Andrews testified he witnessed and was subject to this differential treatment from

23   February 2012 until the time he went on FMLA leave in May 2012.  Walters Decl. ¶¶ 28-29;

24   Andrews Dep. 227:14–228:18.  A reasonable jury might conclude Mr. Andrews was subjected to

25   repeated incidents of harassment based on race, whether directly or indirectly.  *El-Hakem* 415

26   F.3d at 1073; *see also Smithberg*, 575 F. Supp. at 83.

27            Defendants' motion for summary judgment in this respect is DENIED.

28

1          5.        Failure to Prevent Race Discrimination

2                 It also is an unlawful employment practice under FEHA "for an employer . . . to

3     fail to take all reasonable steps necessary to prevent discrimination and harassment from

4     occurring" in the workplace.  Cal. Gov't Code § 12940(k).  When a plaintiff seeks to recover

5     damages based on a claim of failure to prevent discrimination or harassment, he must show three

6     essential elements: (1) plaintiff was subjected to discrimination, harassment or retaliation;

7     (2) defendant failed to take all reasonable steps to prevent discrimination, harassment or

8     retaliation; and (3) this failure caused the plaintiff to suffer injury, damage, loss or harm.  *Achal v.*

9     *Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 804 (N.D. Cal. 2015) (interpreting FEHA).  Some

10    examples of "reasonable steps" available to remedy harassment or discrimination under FEHA

11    include "affirmatively raising the subject of harassment [or discrimination], expressing strong

12    disapproval, developing appropriate sanctions, informing employees of their right to raise and

13    how to raise the issue of harassment [or discrimination] under California law, and developing

14    methods to sensitize all concerned."  *Id.*  Other reasonable steps include the establishment and

15    promulgation of antidiscrimination policies and the implementation of effective procedures to

16    handle discrimination-related complaints and grievances.  *Cal. Fair Emp't & Hous. Comm'n v.*

17    *Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1025 (2004).  The causation element requires

18    an employee to show the discriminatory conduct was a "substantial factor" in causing his harm.

19    *Alamo v. Practice Mgmt. Info. Corp.*, 219 Cal. App. 4th 466, 480 (2013).  Termination from

20    employment is an injury sufficient to support recovery under a failure to prevent discrimination

21    claim.  *See Gemini Aluminum Corp.*, 122 Cal. App. 4th at 1021.

22                 Here, defendants argue Mr. Andrews' failure to prevent discrimination claim fails

23    because Mr. Andrews has not shown he suffered racial discrimination as a matter of law.  Mot. at

24    21–22.  But as noted above, the court has denied summary judgment to defendants on

25    Mr. Andrews' race discrimination claim.  Here as well, defendants have not borne their burden

26    and their motion is DENIED.

27

28

23

1        6.        Wrongful Termination in Violation of Public Policy

2                As a matter of California common law, "when an employer's discharge of an

3    employee violates fundamental principles of public policy, the discharged employee may

4    maintain a tort action and recover damages traditionally available in such actions." *Tameny v.*

5    *Atl. Richfield Co.*, 27 Cal. 3d 167, 170 (1980); *see also Freund v. Nycomed Amersham*, 347 F.3d

6    752, 758 (9th Cir. 2003).  The public policy implicated must be "(1) delineated in either

7    constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the

8    public' rather than serving merely the interests of the individual; (3) well established at the time

9    of discharge; and (4) substantial and fundamental." *Freund*, 347 F.3d at 758 (quoting *City of*

10   *Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1159 (1998)).

11               The public policy implicated by Mr. Andrews' claim here is that articulated in

12   Labor Code section 1102.5, which prohibits employers from retaliating against an employee for

13   disclosing information to a government or law enforcement agency, where the employee has

14   reasonable cause to believe the information discloses a violation of state or federal statute.  Cal.

15   Lab. Code § 1102.5(b); *Cramer v. Consol. Freightways, Inc.*, 209 F.3d 1122, 1134 n.12 (9th Cir.

16   2000) (analyzing section 1102.5).  The purpose of section 1102.5 is to "encourage workplace

17   whistleblowers to report unlawful acts without fearing retaliation." *Hollie v. Concentra Health*

18   *Servs., Inc.*, No. 10–5197, 2012 WL 993522 at *5 (N.D. Cal. Mar. 23, 2012) (citing *Green v.*

19   *Ralee Eng'g Co.*, 19 Cal. 4th 66, 77 (1998)).

20               Here, a reasonable juror could conclude one or more of Mr. Andrews' complaints

21   to the National Labor Relations Board on June 17, 2012, Andrews Decl. Ex. B, the California

22   Department of Pesticide Regulation on August 23, 2012, Andrews Dep. 169:15–16, 176:22–

23   177:4, and the DFEH on June 25, 2012, Daniels Decl. Ex. B, amount to disclosure of a violation

24   of a state or federal statute.  Cal. Lab. Code § 1102.5(b); *Cramer*, 209 F.3d at 1122.

25               Defendants argue Mr. Andrews' claim for wrongful termination in violation of

26   public policy fails as "entirely derivative" of his FEHA claims.  Mot. at 22.  As noted, the court

27   has denied summary judgment on Mr. Andrews' racial discrimination claim.  Defendants have

28   not borne their burden, and their motion is DENIED.

24

1      7.      Summary

2            In sum, defendants' motion is DENIED on Mr. Andrews' state claims of racial

3      discrimination, hostile work environment, failure to prevent discrimination, and wrongful

4      termination in violation of public policy.  Defendants' motion is GRANTED on Mr. Andrews'

5      state disability discrimination claims for failure to accommodate and failure to engage in the

6      interactive process.  The court now proceeds to the merits of Mr. Andrews' federal claims.

7      C.      Federal Claims

8            1.      Race Discrimination in Violation of § 1981

9            In analyzing Mr. Andrews' race discrimination claim under § 1981, the court

10     applies the same legal principles as in a Title VII disparate treatment case, akin to the burden-

11     shifting framework governing FEHA race discrimination claims.  *See, e.g., Fonseca v. Sysco*

12     *Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849-50 (9th Cir. 2004).  Once the plaintiff establishes a

13     prima facie case of discrimination, defendant must then articulate a legitimate, nondiscriminatory

14     reason for its conduct; if defendant surpasses this hurdle, plaintiff then may defeat summary

15     judgment by showing defendant's reasons are pretextual.  *Id.*

16           Here, as noted in the FEHA race discrimination analysis above, a reasonable jury

17     could conclude Mr. Andrews has established a prima facie case, defendants point to a "legitimate,

18     nondiscriminatory reason," but Mr. Andrews has undermined the veracity of that reason.

19     Accordingly, the evidence in the record may convince a reasonable juror that a discriminatory

20     reason more likely than not motivated PRIDE as the employer in the termination decision.

21           Defendants' motion on this claim is DENIED.

22           2.      Retaliation in Violation of § 1981

23           Defendants argue Mr. Andrews has not established a causal link between his

24     protected activity and his termination.  Mot. at 21–22.  Mr. Andrews contends the causal link

25     between his protected activity and his termination may be established by "the temporal sequence

26     between the protected expression and the adverse action."  Opp'n at 13.

27           As with plaintiff's § 1981 and FEHA race discrimination claims, the court applies a

28     burden-shifting framework, where the plaintiff must first establish a prima facie case of

1   retaliation, the defendant must then articulate legitimate, nondiscriminatory reasons for its

2   allegedly retaliatory conduct, and the plaintiff must then show pretext.  *Fonseca*, 374 F.3d at 849-

3   50.

4           To make out a prima facie case of retaliation under § 1981, a plaintiff must

5   establish he undertook protected activity, his employer subjected him to an adverse employment

6   action, and there is a causal link between those two events.  *Vasquez*, 349 F.3d at 646.  To engage

7   in protected activity, the plaintiff must oppose an unlawful employment practice under § 1981.

8   *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) ("[T]he opposed conduct must

9   fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation.").  An

10  adverse employment action is one that is "reasonably likely to deter employees from engaging in

11  protected activity."  *Vasquez*, 349 F.3d at 646.  Where the plaintiff seeks to establish causation

12  solely with evidence of close proximity, the adverse action must follow within a relatively short

13  time after the protected activity.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per

14  curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of

15  protected activity and an adverse employment action as sufficient evidence of causality to

16  establish a prima facie case uniformly hold that the temporal proximity must be very close.").

17          Mr. Andrews contends he engaged in protected activity when he first took FMLA

18  leave on May 7, 2012, Andrews Dep. 227:14–228:18, filed a workers' compensation claim on

19  May 31, 2012, Andrews Decl. Ex. C, filed a complaint with the California Department of

20  Pesticide Regulation on August 23, 2012, Andrews Dep. 169:15–16, filed a claim with the NLRB

21  on June 17, 2012, Andrews Decl. Ex. B, and filed FEHA complaints with the DFEH on June 25,

22  2012 and February 4, 2014, Daniels Decl. ¶ 7.

23          Assuming these actions constitute "protected activity," and that the February 2014

24  filing counts in the analysis, the smallest temporal gap between Mr. Andrews' last protected

25  activity in February 2014 and his termination is 148 days, or approximately five months.  The

26  record includes no other evidence reasonably supporting a connection between Mr. Andrews'

27  protected activity and his termination.  Five months is not sufficient to show adverse action

28  followed "within a relatively short time."  *See Fisher v. San Pedro Peninsula Hosp.*,

1   214 Cal. App. 3d 590, 615 (1989)*; Jadwin v. Cty. of Kern*, 610 F. Supp. 2d 1129, 1156 (E.D. Cal.

2   2009) (five to six month gap in context of a section 1102.5 claim insufficient); *see also Breeden*,

3   532 U.S. at 273–74 (20-month period in Title VII case insufficient); *Cornwell v. Electra Cent.*

4   *Credit Union*, 439 F.3d 1018, 1034 (9th Cir. 2006) (8-month period in Title VII case

5   insufficient)*; Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period in

6   FMLA case insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–1175 (7th Cir. 1992)

7   (4-month period in Title VII retaliation case insufficient).

8          Mr. Andrews has not established there is a triable fact as to his § 1981 retaliation

9   claim, and defendants' motion for summary judgment on this claim is GRANTED.

10                         3.      Interference with Exercise of FMLA Rights

11         Defendants contend Mr. Andrews' FMLA claims alleging retaliation and

12   discriminatory termination fail as a matter of law.  Mot. at 25.

13                         a)      Anti-Termination and Anti-Retaliation Claims

14         Mr. Andrews alleges he was retaliated against and terminated in violation of the

15   FMLA.  SAC ¶¶ 139–159.  "In the Ninth Circuit, the anti-retaliation or anti-discrimination

16   provisions do not cover visiting negative consequences on an employee simply because he has

17   used FMLA leave."  *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001).

18   Instead, the anti-termination and retaliation provisions apply to discrimination and retaliation

19   against an employee after that employee has opposed an employer's violation of the FMLA.  *Id.*

20   Accordingly, where plaintiff alleges defendants terminated him based on the exercise of FMLA

21   rights, he has an interference claim under the FMLA.  *Id.*  Here, Mr. Andrews alleges only that

22   defendants retaliated against and terminated him because he exercised his right to take FMLA

23   leave, SAC ¶ 152, so the court construes his allegations as a single interference claim under the

24   FMLA, *Bachelder*, 259 F.3d at 1124.

25                         b)      Interference Claim

26         The FMLA prevents an employer from interfering with the employee's right to

27   take leave by refusing to authorize leave, discouraging the use of leave, or considering leave as a

28   negative factor in an employment action.  *Liu v. Amway Corp.*, 347 F.3d 1125, 1132–33 (9th Cir.

1   2003).  To prevail on an interference claim, the plaintiff must prove by a preponderance of the

2   evidence that the taking of FMLA-protected leave constituted a negative factor in the decision to

3   terminate him.  *Bachelder*, 259 F.3d at 1125.  The plaintiff can prove this claim by using either

4   direct or circumstantial evidence, or both.  *Id.*

5            Here, there is evidence bearing on the employer's motives: PRIDE told

6   Mr. Andrews when it fired him that it based its decision on his inability to follow the directions of

7   the October 2, 2012 letter requiring that Mr. Andrews contact Andre Anthony by October 23,

8   2012 regarding his return to work.  Walters Decl. Ex. M.  Additionally, PRIDE contends it

9   terminated Mr. Andrews because of his disciplinary write-ups.  *Id.* Ex. C.  Mr. Andrews does not

10  point to any evidence suggesting his FMLA absence was considered a "negative factor" in the

11  firing decision.  Further, after an independent review of the record, the court finds no evidence

12  suggesting the FMLA absence was considered a negative factor, or that PRIDE's reason for

13  terminating Mr. Andrews was mere pretext to camouflage any interference with Mr. Andrews'

14  FMLA rights.  *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.

15  2001) (the court is not required to "comb the record" to find some reason to deny summary

16  judgment).  Construing the evidence in a light most favorable to Mr. Andrews, no reasonable

17  juror could conclude Mr. Andrews was terminated on account of his FMLA leave.  If anything,

18  PRIDE allowed a lengthy leave without expressing concern about the reason for the leave or its

19  length.  Defendants' motion on this claim is GRANTED.

20                    4.      Summary

21            In sum, defendants' motion for summary judgment as to federal claims is DENIED

22  on Mr. Andrews' § 1981 race discrimination claim, GRANTED on his § 1981 retaliation claim,

23  and GRANTED on his FMLA retaliation and discrimination claims construed as an interference

24  claim.

25  V.      CONCLUSION

26            For the foregoing reasons, the court DENIES defendants' motion for summary

27  judgment on the following claims: (1) FEHA race discrimination, (2) FEHA hostile environment,

28  (3) FEHA failure to prevent discrimination, (4) wrongful termination in violation of public policy

1  and (5) § 1981 race discrimination.  The court GRANTS defendants' motion for summary

2  judgment on the following claims: (1) disability discrimination in the form of failure to

3  accommodate, (2) disability discrimination in the form of failure to engage in interactive process,

4  (3) § 1981 retaliation, and (4) interference with FMLA rights.

5        This order resolves ECF No. 65.

6        IT IS SO ORDERED.

7  DATED:  September 30, 2016.

10                    UNITED STATES DISTRICT JUDGE

29