1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    NAPOLEON ANDREWS,                          No.  2:14-cv-02154-KJM-AC

12                   Plaintiff,

13          v.                                    AMENDED ORDER

14    PRIDE INDUSTRIES and JEAN
      ZURBUCHEN,
15
                     Defendants.
16

17

18    I.      REASON FOR AMENDMENT

19                   On October 21, 2016, defendants moved for reconsideration of the court's decision

20    on the federal enclave doctrine question raised in this case, contending there were factual errors

21    upon which the court's decision was based.  Defs.' Mot. 5, ECF No. 97.  In particular, defendants

22    contend no evidence in the record establishes the events giving rise to Mr. Andrews' claims

23    occurred at David Grant Medical Center.  *Id.*

24                   As explained in the court's separate order on defendants' motion for

25    reconsideration, ECF No. 110, defendants' motion is GRANTED IN PART, to the extent the

26    court amends this order to strike reference to David Grant Medical Center.  The amendments are

27    incorporated below.

28    /////

                                                    1

1    II.    INTRODUCTION

2            From May 2009 until November 2012, Napoleon Andrews worked for PRIDE

3    Industries, leading a crew of disabled employees at Travis Air Force Base (AFB) in Fairfield,

4    California.  Starting in May 2012, Mr. Andrews went on leave under the Family and Medical

5    Leave Act (FMLA), taking an extended absence he attributed to stress and anxiety stemming

6    from racial and disability discrimination in the workplace.  Near the end of his FMLA leave,

7    Mr. Andrews was terminated.  In September 2014, Mr. Andrews filed this suit against PRIDE and

8    his supervisor there, Jean Zurbuchen, alleging a variety of violations, including racial and

9    disability discrimination, retaliation, harassment, and wrongful termination.  After the close of

10   discovery, both defendants have moved for summary judgment.

11           At hearing on defendants' motion, Andrea Rosa appeared for Mr. Andrews, and

12   David Daniels and Jennifer Calderon Schmuldt appeared for PRIDE and Ms. Zurbuchen.  ECF

13   No. 86.  As explained below, defendants' motion is GRANTED in PART and DENIED in PART.

14   III.    PROCEDURAL HISTORY

15           Mr. Andrews originally filed this action against PRIDE and Ms. Zurbuchen on

16   September 16, 2014 in the Solano County Superior Court.  First Am. Compl. (FAC), ECF No. 3.

17   He asserted the following six claims: (1) disability discrimination and failure to accommodate;

18   (2) failure to engage in the interactive process; (3) race discrimination; (4) hostile work

19   environment; (5) failure to prevent discrimination; and (6) wrongful termination in violation of

20   public policy.  FAC at ¶¶ 72–125.  With the exception of Mr. Andrews' common law wrongful

21   termination claim, all claims alleged violations of the California Fair Employment Housing Act

22   (FEHA).  *See id.*  Defendants then removed the case to this court, contending the federal enclave

23   doctrine, discussed in more detail below, establishes federal jurisdiction.  Not. Remov. 2, ECF

24   No. 2.  After removal, defendants filed a motion to dismiss.  ECF No. 6.

25           A.    Motion to Dismiss First Amended Complaint

26           In their motion to dismiss, defendants argued the federal enclave doctrine

27   precluded Mr. Andrews' state-law claims.  *Id.* at 5–7.  Essentially, defendants argued the conduct

28   /////

2

giving rise to Mr. Andrews' claims occurred on Travis AFB, a federal enclave, and any attempt to subject such conduct to state regulation was precluded.  *Id.*

Defendants did not prevail on this theory because it was unclear whether the events underlying this action occurred on a federal enclave not subject to state regulation.  Order on MTD (Prev. Order) 7–8, ECF No. 18.  In denying defendants' motion to dismiss, the court allowed Mr. Andrews the opportunity to conduct discovery on the federal enclave issue, as well as leave to file a second amended complaint.  *Id.* at 9.

B.    Second Amended Complaint

Mr. Andrews' second amended complaint asserts the same state-law claims as his first amended complaint, but further asserts the following federal claims: (1) race discrimination in violation of 42 U.S.C. § 1981; (2) retaliation also in violation of § 1981; (3) discriminatory termination in violation of the FMLA; and (4) retaliation also for exercising the right to FMLA leave.  *See generally* Second Am. Compl.  (SAC), ECF No. 25.  Mr. Andrews' suit is grounded on federal question and supplemental jurisdiction.  28 U.S.C. §§ 1331, 1367.

Defendants now move for summary judgment.  Mot., ECF No. 65.  Mr. Andrews opposes the motion, Opp'n, ECF  No. 80, and defendants have replied, Reply, ECF No. 81.

IV.    FACTUAL BACKGROUND

The following facts are undisputed unless otherwise stated.  Where a genuine dispute exists, the court draws reasonable inferences in favor of Mr. Andrews.  *Tolan v. Cotton*, ___U.S.___, 134 S. Ct. 1861, 1868 (2014) (per curiam).

A.    PRIDE Hires Mr. Andrews

PRIDE Industries is a federal contractor; it services Travis AFB.  Undisputed Material Fact (UMF) No. 1, ECF No. 80-5; Prev. Order at 7.  Napoleon Andrews was hired as Grounds Maintenance Lead in May 2009, and was responsible for leading a crew of employees with disabilities in landscaping duties.  UMF No. 3.  He also was responsible for maintaining the grounds of buildings on the base, cutting grass with lawn mowers, and trimming hedges.  Walters

*/////*

3

1    Decl. ¶ 11, ECF No. 70.  Jean Zurbuchen was the Manager of Grounds Maintenance at PRIDE,

2    and Mr. Andrews' supervisor.  Walters Decl. ¶ 8.

3           Mr. Andrews is African-American and speaks fluent Spanish.  Andrews Decl. ¶ 2,

4    ECF No. 80-2; Andrews Dep. 440:25–441:6.

5        B.    May 2010 to May 2012: Disciplinary Write-ups

6           Soon after Mr. Andrews started work at PRIDE, he began to receive a series of

7    disciplinary write-ups.  Walters Decl. ¶¶ 16–20; Ex. C.  For example, in May 2010, Mr. Andrews

8    was sanctioned for "failure to follow instructions" when he did not complete paperwork after

9    mowing around two buildings on the base.  Walters Decl. Ex. C at 22.  On August 13, 2010,

10   Mr. Andrews received a written warning for arriving at work fifteen minutes late.  *Id.*  On

11   July 15, 2011, Mr. Andrews received a document titled "final written warning" for a "safety

12   violation," due to driving a PRIDE truck with its tailgates unsecured.  *Id.*  Despite receiving a

13   "final warning," Mr. Andrews continued to work for PRIDE.  On August 8, 2011, Mr. Andrews

14   was disciplined for unnecessarily spraying an area for weeds.  *Id.*  On February 22, 2012,

15   Mr. Andrews received another "final written warning" for failure to follow instructions and poor

16   work performance, because he did not report that work under his supervision was "incomplete."

17   *Id.*  Again, Mr. Andrews was allowed to continue working.  While the record does not make clear

18   who delivered the disciplinary write-ups to Andrews, Ms. Zurbuchen signed the written warnings.

19   *See id.* at 26–36.

20          During the same time period Mr. Andrews received these write-ups, PRIDE also

21   gave Mr. Andrews performance reviews.  *Id.* 37–39.  According to a June 2010 performance

22   review, Mr. Andrews was rated as "meeting expectations" in the following areas: (1) team player

23   and presenting a positive, courteous attitude toward all employees; and (2) providing customer

24   service through demonstrative courtesy and respect towards customers.  *Id.*  Mr. Andrews met

25   expectations but needed improvement or training in attendance, job knowledge, initiative, and

26   quality or quantity of work.  *Id.*  The performance review further noted Mr. Andrews was a

27   positive lead, "but needs to show his guys that he can be a leader and get them to work the way he

28   wants them to."  *Id.*  Mr. Andrews received the same ratings in his June 2011 performance

4

1  review, except the review noted Mr. Andrews "needs to work with his crew on all times even

2  when spraying or working on paper work." *Id.*

3       His disciplinary write-ups notwithstanding, Mr. Andrews was neither demoted nor

4  was his pay decreased. *Id*. ¶ 13.  During a morning roll call at Travis AFB on April 30, 2012,

5  however, PRIDE management publicly announced Mr. Andrews would be reassigned from his

6  Grounds Maintenance Lead position to a lower-level detail position.  Andrews Decl. ¶ 17, ECF

7  No. 80–2.  Ms. Zurbuchen was partially responsible for this decision, as it was part of her

8  responsibility to decide where to assign Ground Maintenance Leads.  *Id.*; Walters Decl. Ex. C.

9  Although the lower-level detail position did not involve a pay cut, Mr. Andrews would lead fewer

10  employees and would be subject to daily assignment changes.  Andrews Decl. ¶ 17.  He was

11  initially told he would be in this position for one week, but the position was later extended to two

12  weeks.  *Id.*  Before the two weeks ended, Mr. Andrews went out on leave, as described below.

13      C.    May 2009 to May 2012: Discriminatory Treatment

14       Also during the same time period he received disciplinary write-ups, Mr. Andrews

15  witnessed and personally experienced discriminatory treatment.  Andrews Dep. 443:2–14.  For

16  example, when a Caucasian co-worker ruptured a main water line to a building Andrews

17  described as "one of the most important buildings" at the AFB, PRIDE supervisors commented,

18  "Oh, wasn't that cute, [the coworker] hit that pipe?"  *Id.* 443:2–14.  When another Caucasian

19  co-worker was insubordinate with a union representative, the co-worker did not receive a write-

20  up, and no disciplinary action was taken.  *Id.* 447:24–448:15.  The record does not make clear

21  whether these co-workers had a disability, as some PRIDE employees do.  Mr. Andrews, by

22  contrast, received several citations for offenses he deems less serious, as noted above.

23       Mr. Andrews also witnessed and experienced treatment by Ms. Zurbuchen that he

24  considered unfair.  In particular, Mr. Andrews alleges Ms. Zurbuchen forbid him from speaking

25  Spanish in the workplace, and often referred to his Mexican coworkers as "the Mexican Mafia."

26  Rosa Decl. ¶ 18, Exhibit Q, ECF No. 80–1; Andrews Dep. 49:5–8, 50:10–13.  In his declaration,

27  Mr. Andrews stated because many of his co-workers were Spanish monolingual speakers, it was

28  important for him to speak and write Spanish so he could help his crew or other laborers

1    understand what was being asked of them.  Andrews Decl. ¶ 6.  Because many PRIDE

2    supervisors and managers did not speak Spanish, very few people other than Mr. Andrews could

3    assist his co-workers.  *Id.*  However, other evidence in the record suggests speaking Spanish in

4    the workplace was allowed, and the prohibition on speaking Spanish was acceptable only "under

5    limited circumstances," such as speaking to a manager who only speaks English or in an

6    emergency situation.  Rosa Decl. Ex. Q at 145.

7        Ms. Zurbuchen also called Mr. Andrews "slow," on numerous occasions, and at

8    least once threatened to terminate Mr. Andrews by showing him pictures of minorities who had

9    been fired or wrongfully terminated at PRIDE while telling him, "You could be in this group."

10   Andrews Dep. 49:8, 49:22–50:4.  Ms. Zurbuchen also uttered the word "nigger" in front of

11   Mr. Andrews, in the context of asking whether Mr. Andrews himself used that word at work.

12   Andrews Dep. 49:8–10.  At his deposition, Mr. Andrews testified Ms. Zurbuchen's comments

13   caused him to feel intimidated and to lose concentration while at work.  Andrews Dep. 48:6–22.

14       D.    May 7, 2012: Leave from PRIDE

15       As mentioned, the discriminatory treatment he witnessed and experienced caused

16   Mr. Andrews "memory loss, anxiety, and [an] inability to concentrate."  Andrews Dep.

17   45:24-46:1.  In particular, Mr. Andrews had difficulty concentrating on his job without seeming

18   anxious or fidgety or having to leave work for short periods of time.  Andrews Dep. 46:19–47:4.

19   On May 7, 2012, he went on leave from his job at PRIDE under the FMLA.  Andrews Dep.

20   227:14–228:18; Walters Decl. ¶¶ 28–29.  Mr. Andrews made numerous requests to extend his

21   leave, reviewed below.  UMF Nos. 37, 39.

22       E.    Requests for Extended FMLA Leave

23       In support of his initial request for FMLA leave, Mr. Andrews' primary doctor

24   Dr. Tuan Doan, gave Mr. Andrews a medical note, dated May 7, 2012, stating "unable to work

25   since May 7, 2012, due to medical illness, return back to work on May 21, 2012," which

26   Dr. Doan submitted to PRIDE.  UMF No. 33; Walters Decl. ¶¶ 25, 28.  The parties dispute

27   whether PRIDE actually received Dr. Doan's note.  *Compare* Walters Decl. ¶¶ 25, 28, *with*

28   Andrews Decl. ¶ 19.  On the one hand, Mr. Andrews avers Dr. Doan faxed the note to PRIDE on

1    May 7, 2012, Mr. Andrews' first day of FMLA leave.  Andrews Decl. ¶ 19.  On the other hand,

2    PRIDE says it did not receive the May 7 note, but instead, received an different note on May 16,

3    2012 requesting leave until August 4, 2012.  Walters Decl. ¶ 25.  PRIDE avers that from May 8,

4    the day after Mr. Andrews went on leave, until May 15, 2012, PRIDE received no communication

5    from Mr. Andrews.  Walters Decl. ¶ 28.  In any event, PRIDE cites to evidence showing that on

6    May 16, 2012, it granted Mr. Andrews' request for leave, and extended his leave from July 31 to

7    August 4, 2012.  *Id.*

8              F.       Second Request for Extended Leave

9              The same day PRIDE granted Mr. Andrews' request for extended FMLA leave, it

10   also requested that Mr. Andrews complete and return paperwork.  Walters Decl. ¶ 29.

11   Mr. Andrews did not return the paperwork to PRIDE.  Walters Decl. ¶ 30.   However,

12   Mr. Andrews submitted a new medical note from Dr. Doan, dated July 25, 2012, in support of

13   extending his medical leave from August 4, 2012 to November 4, 2012.  UMF No. 39.  Before

14   granting this request, PRIDE ordered Mr. Andrews to obtain answers from Dr. Doan to a

15   reasonable accommodations questionnaire by August 16, 2012.  UMF No. 40.

16             Dr. Doan completed the questionnaire on August 6, 2012, but PRIDE did not

17   receive it until August 27, 2012.  UMF No. 42.  In the questionnaire, Dr. Doan noted

18   Mr. Andrews had stress disorder, generalized anxiety disorder, as well as a latex allergy.  Walters

19   Decl. Ex. J at 59–66.  These conditions affected at least four major life activities including

20   breathing, working, concentrating, and interacting with others.  *Id.*  Dr. Doan also noted the

21   medication for Mr. Andrews' conditions would prevent him from operating heavy machinery, and

22   this restriction was expected to last until October 30, 2012.  *Id.*

23             PRIDE interpreted the questionnaire to mean Mr. Andrews would be able to return

24   to work after October 30, 2012, and issued a letter granting Mr. Andrews' request to extend his

25   leave to that date.  Walters Decl. Ex. K.  Specifically, it granted Mr. Andrews' second request in

26   an October 2, 2012 letter, which stated in part,

27                      If you are able to return to work on October 31, 2012, you must
                       provide [a] note from your doctor that clears you to return to work
28                     and that lists any and all restrictions.  Please contact your Local HR

7

Representative, Andre Anthony at [phone number provided] by October 23, 2012 to either provide the return to work note and to arrange for your return to work, or to resign your position.

*Id.* The parties dispute whether October 23 was a hard deadline or a due date contingent on whether Mr. Andrews was able to return to work on October 31, 2012. *Compare* Walters Decl. ¶ 35 *with* Andrews Decl. ¶ 35. PRIDE argues the letter clearly required Mr. Andrews to contact Andre Anthony by October 23, 2012. Walters Decl. ¶ 35. Mr. Andrews argues the letter required him to contact Andre Anthony by October 23, 2012 only if he was able to return to work by October 31, 2012. Andrews Decl. ¶ 35. Mr. Andrews understood he did not have to respond to PRIDE because he was unable to return to work by October 31. *Id.* Regardless, Mr. Andrews neither returned the paperwork nor indicated a desire to resign his position by October 23, 2012. Walters Decl. ¶ 37.

G.     Third Request and Termination

On October 22, 2012, PRIDE received another medical note from Dr. Doan, dated October 16, 2012, requesting a third extension of leave for Mr. Andrews to adjust his medications, and stating that Mr. Andrews could return to work on November 16, 2012. Walters Decl. ¶ 36; Ex. L. PRIDE did not hear anything more from Mr. Andrews until November 15, 2012, when he sent a letter stating he was not resigning from his job, he appreciated the time allotted to him, and he needed more leave to have a new reasonable accommodation questionnaire completed. Walters Decl. Ex. N.

On the morning of November 16, 2012, Mr. Andrews did not show up for work. Walters Decl. ¶ 39. Mr. Andrews arrived instead in the afternoon to hand-deliver a note from Dr. Doan, dated  November 16, 2012, requesting additional leave. Andrews Decl. ¶ 30. In his declaration, Mr. Andrews notes Dr. Doan was not available to sign the letter that day, so he first hand-delivered the unsigned note to PRIDE, and then waited until Monday, November 19, to get a copy of the note signed. *Id.* When he arrived at PRIDE on November 16, Mr. Andrews met with Donna Walters, the head of HR, and said he was ready to work that day. *Id.* Ms. Walters told him to wait for a letter PRIDE had been working on, which Mr. Andrews later discovered was a termination letter. *Id.*

8

1       On November 19, 2012, the same day PRIDE received the signed medical note

2   from Dr. Doan, Walters Decl. ¶ 40, PRIDE issued a termination letter to Mr. Andrews for "his

3   failure to follow instructions and provide return to work documentation by October 23, 2012, and

4   for his failure to return to work on November 16–19, 2012."  Walters Decl.  ¶ 42 & Ex. M.

5       In making the decision to terminate Mr. Andrews, Ms. Walters consulted with

6   PRIDE's HR representative Andre Anthony, the person responsible for corresponding with

7   Mr. Andrews throughout his FMLA leave.  Anthony Dep. 107:12–13.  Mr. Anthony testified that

8   he told Ms. Walters he did not receive any information from Mr. Andrews by the requested due

9   date of October 23, 2012.  *Id.*  He also testified he did not know whether Mr. Andrews' doctor

10  had made contact with HR, Anthony Dep. 107:18–21, or whether Mr. Andrews contacted anyone

11  besides himself, *id.* 107:14–17.

12      H.      Complaints against PRIDE

13      During his time on FMLA leave, Mr. Andrews filed several claims and complaints

14  against PRIDE.  He filed a workers' compensation claim on May 31, 2012, alleging work-related

15  injuries, including "on the job stress."  Andrews Decl. Ex. C.  He filed a claim with the National

16  Labor Relations Board on June 17, 2012, stating he was disciplined and harassed for his union

17  activity.  Andrews Decl. Ex. B.  During his deposition, Mr. Andrews testified he engaged in

18  union activity related to interrupted meal and rest breaks, without clarifying what kind of activity.

19  Andrews Dep. 215:9–24.  He also filed a complaint with the California Department of Pesticide

20  Regulation on August 23, 2012, for pesticide exposure during his time at PRIDE.  Andrews Dep.

21  169:15–16, 176:22–177:4.

22      Mr. Andrews also filed two administrative claims with the California Department

23  of Fair Employment and Housing (DFEH).  Daniels Decl. ¶ 7, ECF No. 68.  In his first complaint,

24  filed June 25, 2012, Mr. Andrews alleged that between July 2011 and May 2012 he was subjected

25  to differential treatment because of his age and race.  Daniels Decl. Ex. B.  PRIDE responded to

26  the first complaint in a letter to the DFEH, stating Mr. Andrews' claims were "not accurate," and

27  enclosed copies of his write-ups to support its position.  Walters Ex. C.  Mr. Andrews received

28  /////

9

1   two right-to-sue letters for his first DFEH complaint, on April 17 and April 22, 2013. Daniels

2   Decl. Ex. C.

3            In his second complaint, filed February 4, 2014, Mr. Andrews alleged

4   discrimination, harassment, and retaliation based on Mr. Andrews' membership in a protected

5   class, disability, national origin, and race. Daniels Decl. Ex. D.[1] Although the second DFEH

6   complaint alleged only that the discrimination occurred on or before August 30, 2013, without

7   more, the parties agree Mr. Andrews' claims for disability discrimination under FEHA accrued, at

8   the latest, by November 19, 2012, the date Mr. Andrews' termination became effective. UMF

9   No. 25. Mr. Andrews received a right-to-sue letter for his second DFEH complaint later on

10   February 4, 2014; the same day he had filed the second DFEH complaint. Daniels Decl. Ex. D.

11   V.    LEGAL STANDARD

12            A court will grant summary judgment "if . . . there is no genuine dispute as to any

13   material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

14   The "threshold inquiry" is whether "there are any genuine factual issues that properly can be

15   resolved only by a finder of fact because they may reasonably be resolved in favor of either

16   party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

17            Rule 56 also authorizes granting summary judgment on only part of a claim or

18   defense, known as partial summary judgment. *See* Fed. R. Civ. P. 56(a) ("A party may move for

19   summary judgment, identifying each claim or defense—or the part of each claim or defense—on

20   which summary judgment is sought."). The standard that applies to a motion for partial summary

21   judgment is the same as that which applies to a motion for summary judgment. *See State of Cal.*

22

23            [1] The court notes Mr. Andrews' deposition testimony raises a doubt whether he filed this
24   complaint with the DFEH or whether his lawyer, Ms. Andrea Rosa, signed and filed the
complaint without Mr. Andrews' notice or consent. *See* Andrews Dep. 415:9 (when asked about
25   the second DFEH complaint during his deposition, Mr. Andrews stated he did not recall filing it),
415:19 (Mr. Andrews did not recognize complaint or right to sue letter that followed the
26   complaint), 416:11–13 (when asked how he was discriminated against on August 30, 2013,
Mr. Andrews said, "I don't know what they're referring to when they say August 30, 2013."),
27   416:23–25 (when specifically asked if he was discriminated against on August 30, 2013,
Mr. Andrews said, "I know I was fired in November of 2012.").

28

1    *ex rel. Cal. Dep't of Toxic Substances Control v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998)

2    (applying summary judgment standard to motion for summary adjudication); *ARC of Cal. v.*

3    *Douglas*, No. 11–02545, 2015 WL 631426, at *3 (E.D. Cal. Feb. 13, 2015).

4            The moving party bears the initial burden of showing the district court "there is an

5    absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S.

6    317, 325 (1986). The burden then shifts to the nonmoving party, which "must establish that there

7    is a genuine issue of material fact . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

8    475 U.S. 574, 585 (1986). In carrying their burdens, both parties must "cit[e] to particular parts

9    of materials in the record . . . or show [] that the materials cited do not establish the absence or

10   presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to

11   support the fact." Fed. R. Civ. P. 56(c)(1); *see also Matsushita*, 475 U.S. at 586 ("[The

12   nonmoving party] must do more than simply show that there is some metaphysical doubt as to the

13   material facts."). Moreover, "the requirement is that there be no genuine issue of material fact . . .

14   Only disputes over facts that might affect the outcome of the suit under the governing law will

15   properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247–48. A district

16   court is "not required to comb the record to find some reason to deny a motion for summary

17   judgment." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) (internal

18   quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to

19   find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587

20   (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

21   VI.    DISCUSSION

22          A.    Absence of Written Opposition

23          Defendants PRIDE and Ms. Zurbuchen move for summary judgment on each of

24   Mr. Andrews' claims. At the outset, the court notes Mr. Andrews' opposition does not address

25   several arguments defendants make in support of their motion, including the claims of FEHA

26   hostile work environment, § 1981 race discrimination, retaliation in violation of the FMLA, and

27   termination in violation of the FMLA. *See generally* Opp'n. Mr. Andrews' counsel, Ms. Rosa,

28   stated at hearing that she was not abandoning any claims, but represented she did not respond to

11

1   some of defendants' arguments because her original opposition was erased electronically within

2   hours before the court's filing deadline.  With her original opposition having disappeared, counsel

3   explained she scrambled to assemble a decent, working opposition before the filing deadline and

4   haphazardly neglected to address a number of issues.

5          Counsel did not alert the court or defendants to this mishap until she was asked

6   about it at the hearing.  At that point she asked the court to allow leave to attach a table of

7   contents to her opposition brief.  The court denied this request.  Counsel did not request leave to

8   clarify or supplement the substance of her filed opposition, so the court takes the opposition as it

9   finds it.  Nevertheless, the court takes care to consider the merits of plaintiff's position rather than

10  construing counsel's incomplete briefing as partial consent to granting defendants' motion.

11         B.      State Law Claims

12                 1.      Federal Enclave Doctrine

13         Defendants argue, as they did in their prior motion to dismiss, Mr. Andrews' state

14  law claims are barred because the events in question occurred on a federal enclave.  Mot. at 26.

15         The federal enclave doctrine derives from Article I, section 8, clause 17 of the

16  United States Constitution, which provides Congress shall have the power "to exercise [exclusive

17  legislative] Authority over all Places purchased by the Consent of the Legislature of the State in

18  which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other

19  needful Buildings."  U.S.C.A. Const. art. 1, § 8, cl. 17; *see also Pac. Coast Dairy v. Dep't of*

20  *Agric. of Cal.*, 318 U.S. 285, 294 (1943) (citing U.S.C.A. Const. art. 1, § 8, cl. 17) (holding the

21  state of California was not authorized to regulate the sale of milk sold to war department located

22  on federal enclave).  This essentially means, when the federal government acquires a tract of land

23  or property, jurisdiction over the land rests primarily, if not exclusively, with the United States,

24  and "local law not inconsistent with federal policy [may] remain[] in force until altered by

25  national legislation."  *Id.*

26         Here, in its order on defendants' motion to dismiss, the court concluded the land

27  designated as Travis AFB qualified for federal enclave status.  Prev. Order at 7.  But because it is

28  unclear whether the events the events underlying this action occurred on a federal enclave,] the

1    court noted it could not say at that point whether defendants' alleged conduct took place on a

2    federal enclave. *Id.* Although the parties have engaged in full discovery, neither party presented

3    new evidence on this issue, and defendants' mere reiteration of their previously unsupported

4    argument does not assist the court or make their case.

5            Defendants' motion for summary judgment on the basis of the federal enclave

6    doctrine is DENIED, and the court proceeds to the merits of Mr. Andrews' state law claims.

7                        2.      Disability Discrimination

8            Defendants argue first that they are entitled to summary judgment because

9    Mr. Andrews' disability discrimination claims for failure to accommodate and failure to engage

10   in the interactive process are barred by FEHA's one-year statute of limitations. Mot. at 13.

11   Mr. Andrews argues the statute of limitations was tolled as a result his pending workers'

12   compensation claim, which he argues addressed the same injuries supporting his discrimination

13   claim, namely on-the-job stress. Opp'n at 14.

14           FEHA prohibits discrimination in employment on the basis of physical or mental

15   disability. Cal. Gov't Code § 12940(a); *Jimeno v. Mobil Oil Corp.*, 66 F.3d 1514, 1520 (9th Cir.

16   1995) (interpreting FEHA). The Ninth Circuit has held FEHA provisions relating to disability

17   discrimination are based on the ADA, *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1133 n.3

18   (9th Cir. 2001), and "stress" can be considered a mental impairment under the ADA, *see Snead v.*

19   *Metro. Prop. & Cas. Ins. Co.*, 237 F.3d 1080, 1088 (9th Cir. 2001).

20           The statute of limitations for a FEHA action is found in California Government

21   Code section 12960, which provides, "[n]o complaint may be filed after the expiration of one year

22   from the date upon which the alleged unlawful practice or refusal to cooperate occurred . . . ."

23   *Cucuzza v. City of Santa Clara*, 104 Cal. App. 4th 1031, 1040 (2002). This statute of limitations

24   can be tolled when the plaintiff submits a workers' compensation claim for the same injury that

25   gives rise to the FEHA claim filed with the court. *See Elkins v. Derby*, 12 Cal. 3d 410, 413

26   (1974).

27           In *Elkins*, the plaintiff filed a timely claim for benefits with the Workmen's

28   Compensation Appeals Board after he was injured while working on the defendants' premises.

13

1    *Id.* at 411.  The Board's decision became final after the statute of limitations applicable to

2    plaintiff's injury ran and the plaintiff then filed a personal injury tort suit for the same injury that

3    had given rise to his workers' compensation claim.  *Id.*  The California Supreme Court held that

4    the limitations period for the plaintiff's personal injury claim was tolled from the day he filed

5    with the Board to the day the Board's decision became final, noting allowing the newly filed civil

6    complaint to proceed would not frustrate the statute of limitations' primary purpose; to prevent

7    surprise to the defendants.  *Id.* at 413 n.1, 416.  The state Supreme Court thus reversed the

8    superior court's holding that plaintiff's personal injury claim was time-barred.  *Id.* at 420.

9         A California Court of Appeals has since construed the equitable tolling doctrine of

10   *Elkins* narrowly, holding the statute of limitations for a personal injury claim is not tolled when a

11   plaintiff pursues a remedy for a wrong related to, but not the same as, the injury underlying a

12   workers' compensation claim.  *Aerojet Gen. Corp. v. Superior Court*, 177 Cal. App. 3d 950, 955

13   (1986).  In *Aerojet*, the plaintiff sued his employer for fraudulent concealment of the cause of his

14   injuries, bringing suit after he filed a workers' compensation claim for the injury itself.  *Id.*  The

15   court held the equitable tolling doctrine did not apply to the plaintiff's fraudulent concealment

16   claim, distinguishing the case from that of *Elkins*.  *Id.* at 954–55.  The court held the plaintiff in

17   *Aerojet* sought to challenge a wrong "entirely [different]" from the injury alleged in his workers'

18   compensation claim, thereby stifling defendants' ability to gather evidence necessary to refute the

19   later filed civil claim.  *Id.* at 955–56.  The plaintiff's claim was dismissed as time-barred.  *Id.* at

20   957.  The Ninth Circuit cited to *Aerojet* as an example of California's longstanding refusal to

21   apply the "equitable tolling doctrine to toll the statute of limitations on a claim for a distinct

22   wrong that was not the basis of the earlier proceeding."  *Daviton v. Columbia/HCA Healthcare*

23   *Corp.*, 241 F.3d 1131, 1141 (9th Cir. 2001).  In the end, the Ninth Circuit's conclusion in *Daviton*

24   aligned with *Aerojet*, because it held "the equitable tolling doctrine requires that the same wrong

25   serve as the predicate for the earlier and later proceedings to make sure defendant received proper

26   notice."  *Id.*

27        Here, there is no dispute the last day Mr. Andrews' claims for disability

28   discrimination could accrue was November 19, 2012, the date his termination became effective.

14

1    UMF No. 25.  Further, it is undisputed that Mr. Andrews filed his disability discrimination claim

2    with the DFEH on February 4, 2014, well more than one year after this accrual date and nineteen

3    months after he filed his racial and age discrimination claims in his first complaint made to

4    DFEH.  Daniels Decl. Exs. B, D.  In short, Mr. Andrews' disability discrimination claims are

5    untimely unless the limitations period is tolled for approximately fourteen months, the difference

6    in time between November 19, 2012, the last accrual date, and February 4, 2014, the date he filed

7    his DFEH complaint for disability discrimination.

8               In the operative complaint, Mr. Andrews alleges PRIDE's failure to accommodate

9    his mental disability and failure to engage in the interactive process serve as the basis of his

10   FEHA disability discrimination claims.  *See* SAC ¶¶ 91–108.  Whereas in his workers'

11   compensation claim Mr. Andrews alleged "on the job stress," nowhere in the instant complaint

12   does Mr. Andrews assert a claim based on this injury alone, including, including by saying

13   defendants discriminated against him because of his stress.  *Compare id. with* Andrews Decl.

14   Ex. C.  In his opposition, Mr. Andrews argues only that "defendant[s] had notice of [the claimed]

15   disability, and [] therefore, cannot demonstrate any prejudice"  Opp'n at 15.  But because

16   Mr. Andrews does not seek to recover in this civil action for the injury at the heart of his workers'

17   compensation claim, as the plaintiff did in *Elkins*, 12 Cal. 3d at 413, but rather for a "different

18   wrong entirely," as in *Aerojet*, 177 Cal. App. 3d at 955–56, his argument is unavailing.

19   Construing the facts in favor of plaintiff, it is not reasonable to conclude a workers' compensation

20   claim for "on the job stress" would have alerted PRIDE to the possibility of disability

21   discrimination claims for failure to accommodate and failure to engage in the interactive process.

22   The time for filing of Mr. Andrews' disability discrimination claims was not equitably tolled, and

23   Mr. Andrews' claims for disability discrimination due to failure to accommodate and

24   discrimination for failure to engage in the interactive process are therefore dismissed as time-

25   barred.

26               Defendants' motion for summary judgment on this claim is GRANTED.

27   /////

28   /////

15

3.      Race Discrimination

Defendants contend they are entitled to summary judgment on Mr. Andrews'
FEHA race discrimination claim, saying, in essence, a jury could not conclude he was terminated
under circumstances suggesting a racially discriminatory motive.  Mot. at 17.

a)      Legal Standard

FEHA makes it "unlawful for an employer to discharge a person on the basis of
race, or otherwise to discriminate against the person in compensation or in terms, conditions or
privileges of employment."  *Mixon v. Fair Emp't and Hous. Comm'n*, 192 Cal. App. 3d 1306,
1316 (1987).  Where "discharge from employment is the challenged action, the complainant must
make an initial showing that plaintiff was discharged from a position for which he was qualified
'under circumstances which give rise to an inference of unlawful discrimination.' "  *Id.* at 1318
(citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  Although the
claimant "need not prove that racial animus was the sole motivation behind the challenged
action," he must nonetheless prove by a preponderance of the evidence that "there was a causal
connection between the employee's protected status and the adverse employment decision."  *Id.*
at 1319.

To determine whether discriminatory discharge occurred, the court engages in a
three-part analysis.  First, to create a rebuttable presumption that the employer unlawfully
discriminated against the employee, a plaintiff must show (1) he belongs to a protected class;
(2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the
protected class were retained in similar jobs.  *Id.* at 1318.  Second, the burden shifts to the
defendant employer "to articulate some legitimate, nondiscriminatory reason for the employee's
rejection."  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If the
defendant employer carries its burden, the court proceeds to the third step, where the plaintiff
must demonstrate pretext, that the defendant's "proffered reason was not the true reason for the
employment decision."  *Id.*  The plaintiff can carry this burden either "directly by persuading the
court that a discriminatory reason more likely motivated the employer, or indirectly by showing
that the employer's proffered explanation is unworthy of credence."  *Id.* at 1318–19.

16

b)      Plaintiff's Prima Facie Case

Here, as an African-American, Mr. Andrews belongs to a protected class for the purposes of FEHA. *See McKinney v. Am. Airlines, Inc.*, 641 F. Supp. 2d 962, 972 (C.D. Cal. 2009) (interpreting FEHA). And it is undisputed he ultimately was terminated. This leaves the second and fourth prongs of the prima facie case analysis.

As to the second, Mr. Andrews' job performance, the evidence includes the performance reviews PRIDE gave Mr. Andrews in July 2010 and June 2011, which included several ratings of "meets expectations," one of which noted Mr. Andrews was a "positive lead." Walters Decl. Ex. C at 37–38. While the reviews also noted room for improvement, they did not characterize his work as unsatisfactory. *Id.* From this, a reasonable juror could find Mr. Andrews' work was satisfactory prior to his termination.

Regarding the fourth prong, additional evidence in the record could convince a reasonable juror to conclude others not in the protected class received more favorable treatment than plaintiff, or were retained in similar jobs despite shortcomings. *See Mixon*, 192 Cal. App. 3d at 1318. During his deposition, Mr. Andrews testified his Caucasian co-workers were not terminated or reprimanded for serious misconduct, whereas he was continually reprimanded for less severe conduct. Andrews Dep. 443:2–14. For example, PRIDE reprimanded Mr. Andrews for coming to work fifteen minutes late and unnecessarily spraying an area for weeds after being instructed not to do so. Walters Decl. Ex. C. But Mr. Andrews testified that when a Caucasian co-worker ruptured the main water line to an important building, PRIDE supervisors said that it was "cute [that the co-worker] hit that pipe." Andrews Dep. 443:2–14. Defendants do not dispute PRIDE managers characterized the Caucasian co-worker's conduct as "cute." Similarly, a reasonable jury might well believe Mr. Andrews was treated differently than another Caucasian co-worker who became insubordinate with a PRIDE union representative but did not receive a write-up or any form of disciplinary action. Andrews Dep. 447:24–448:15.

Mr. Andrews also presents evidence showing his supervisor, Ms. Zurbuchen, subjected him to at least two instances of treatment that could be found discriminatory. In one instance, she pointed to photos of other minorities PRIDE recently fired, while exclaiming

17

1    Mr. Andrews could find himself in that group one day.  Andrews Dep. 49:22–50:4.  Mr. Andrews

2    has submitted evidence that on another occasion Ms. Zurbuchen used the loaded word "nigger" in

3    Mr. Andrews' presence.  *Id.* 427:1-25.  While it is not disputed that Ms. Zurbuchen used the word

4    in the context of asking whether Mr. Andrews himself used that word at work, *id.* 49:8–10, a

5    reasonable juror could conclude the mere utterance of this particular word by a supervisor, instead

6    of referring to the racial epithet as "the n-word," could be "highly offensive and demeaning" to an

7    African-American subordinate.  As the Ninth Circuit has observed, "no single act can more

8    quickly alter the conditions of employment and create an abusive working environment than the

9    use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his

10   subordinates." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004).  Whether this

11   instance reflects racial insensitivity, thus making it more likely Mr. Andrews was terminated

12   under conditions suggesting discrimination, is a question best left for a jury to decide.

13          Although there is no direct evidence of Ms. Zurbuchen's making the ultimate

14   decision to fire Mr. Andrews, there is sufficient circumstantial evidence to raise a genuine issue

15   of material fact regarding Ms. Zurbuchen's role in or influence on the PRIDE termination

16   decision.  As the manager of Grounds Maintenance at PRIDE, Ms. Zurbuchen was involved in

17   deciding where to assign Grounds Maintenance Leads such as Mr. Andrews, and was at least

18   partly responsible for reassigning Mr. Andrews to a lower-level detail position in which he would

19   lead fewer employees and be subject to route changes each day.  Andrew Decl. ¶ 17.  Ms.

20   Zurbuchen signed all of Mr. Andrews' disciplinary write-ups, except one time when she was on

21   vacation.  *Id.* Ex. C at 25–37.  All things considered, a reasonable jury could conclude

22   discriminatory animus infected the decision to terminate Mr. Andrews.  *See Metoyer v.*

23   *Chassman*, 504 F.3d 919, 938 (9th Cir. 2007) (plaintiff showed discriminatory animus in

24   employment decision based on circumstantial evidence of discriminatory animus of plaintiff's

25   supervisor).

26          Viewing the evidence in the light most favorable to plaintiff, a reasonable juror

27   could conclude Mr. Andrews has established his prima facie case of racial discrimination.  The

28   /////

1  burden thus shifts to defendants "to articulate some legitimate, nondiscriminatory reason" for

2  Mr. Andrews' termination.  *Mixon*, 192 Cal. App. 3d at 1318.

3                              c)      Defendant's Nondiscriminatory Reasons

4          Defendants contend Mr. Andrews was terminated because of his failure to follow

5  instructions to communicate with HR representative Andre Anthony by October 23, 2012, as well

6  as his failure to return to work at the expiration of his extended leave of absence.  Mot. at 18.

7  Defendants also contend their ultimate termination decision relied on the repeated disciplinary

8  write-ups Mr. Andrews received throughout his employment.  *Id.*  In a letter sent to the DFEH in

9  response to Mr. Andrews' FEHA race discrimination claim, PRIDE argued Mr. Andrews' race

10  discrimination claim was "not accurate," and enclosed copies of the write-ups to support its

11  position.  Walters Ex. C at 21–37.

12          Defendants have articulated reasons a reasonable jury could find the decision to

13  terminate Mr. Andrews was legitimate and nondiscriminatory.  *See Mixon*, 192 Cal. App. 3d at

14  1306 ("The defendant need not persuade the court that it was actually motivated by the proffered

15  reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it

16  discriminated against the plaintiff.").  The court proceeds to the third step of analysis, pretext.

17                              d)      Pretext

18          At the third step, a reasonable jury could conclude defendants' "proffered

19  reason[s] w[ere] not the true reason[s] for the employment decision."  *Id.* at 1318.  As to

20  PRIDE's first reason for termination, regarding Mr. Andrews' failure to communicate with HR

21  representative Andre Anthony by October 23, 2012, as well as his failure to return to work,

22  Mr. Andrews' doctor communicated with PRIDE by October 22 in a letter requesting additional

23  leave to give Mr. Andrews time to adjust his medications.  Walters Decl. ¶ 36 & Ex. L.

24  Mr. Andrews testified he did show up to work on November 16, the day his extended leave

25  expired, albeit in the afternoon to hand-deliver a note from his doctor requesting still further

26  leave.  Andrews Decl. ¶ 30.  Mr. Andrews also notes he told PRIDE he was ready to start

27  working that day, but Donna Walters in HR told him to wait for a letter PRIDE had been working

28  on, which Mr. Andrews later discovered was the termination letter.  *Id.*

On balance, the state of the record is insufficient for the court to conclude defendants can prevail as a matter of law; rather a reasonable jury could conclude PRIDE's proffered reason is "unworthy of credence." *Mixon*, 192 Cal. App. 3d at 1318–1319. As to PRIDE's reliance on the disciplinary write-ups, defendants' argument is belied by the performance reviews PRIDE gave Mr. Andrews in the same timeframe of July 2010 and June 2011, which included several ratings of "meets expectations," and noted Mr. Andrews was a "positive lead," and did not affect his work assignment in any way. Walters Decl. Ex. C at 37–38. Moreover, Mr. Andrews' last disciplinary write-up occurred in February 2012, more than eight months before he was terminated, and aside from the short-term reassignment, Mr. Andrews was never demoted or at actual risk of termination. *Id.* Defendants' argument is further belied by the termination letter PRIDE sent to Mr. Andrews, which did not attribute his termination to his disciplinary write-ups, but only to his delays in contacting HR representative Andre Anthony regarding his return date. Walters Decl. Ex. M.

Mr. Andrews may be able to establish pretext, if the jury reaches the question. Summary judgment is DENIED on the race discrimination claim.

### 4.      Hostile Work Environment

Harassment in the form of a hostile work environment constitutes unlawful discrimination in violation of FEHA. *Lyle v. Warner Bros. Television Prod.*, 38 Cal. 4th 264, 279 (2006). Although commonly alleged in connection with sex and gender, a hostile work environment claim also may be based on other protected characteristics, including race. *Vasquez v. Cty. of L.A.*, 349 F.3d 634, 642 (9th Cir. 2003).

Because California courts look to Title VII cases to guide their interpretation of FEHA, this court looks to *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) to determine what showing is required in a hostile environment claim. *See Brooks v. City of San Mateo,* 229 F.3d 917, 923 (9th Cir. 2000) (Title VII and FEHA operate under the same guiding principles). The *Rene* court held a plaintiff must show the following to prevail on a hostile work environment claim: (1) she was subjected to verbal or physical conduct, (2) the conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the

1    conditions of the plaintiff's employment and create an abusive working environment. *Id.* The

2    only question here is whether Mr. Andrews has satisfied the third element. *See* Mot. at 24.

3              While a "mere utterance of an ethnic or racial epithet which engenders offensive

4    feelings in an employee" will not, by itself, establish a case, a plaintiff can overcome a motion for

5    summary judgment when the employer has "created a working environment heavily charged with

6    ethnic or racial insult and ridicule." *Etter v. Veriflo Corp.*, 67 Cal. App. 4th 457, 463 (1998). The

7    plaintiff need not show explicitly racialized conduct, for calling someone names of a different sort

8    can serve as a proxy for race and ethnicity. *El-Hakem v. BJY Inc.*, 415 F.3d 1068, 1073 (9th Cir.

9    2005) (interpreting § 1981 and Title VII). In *El-Hakem*, for example, the Ninth Circuit held

10   triable issues of fact precluded summary judgment when the plaintiff's employer repeatedly

11   insisted on calling the plaintiff  "Manny" instead of by his Arabic name, despite the plaintiff's

12   strenuous objections. *Id.* at 1071. Physical conduct also can support a hostile environment claim.

13   In *Manatt v. Bank of America*, for example, the Ninth Circuit held the plaintiff was subject to a

14   hostile environment where her co-workers ridiculed her not only for mispronouncing "Lima," but

15   also pulled their eyes back in mocking imitation of her appearance and Asian heritage. 339 F.3d

16   792, 794–95, 798 (9th Cir. 2003) (interpreting § 1981 and Title VII).

17             Here, defendants argue Mr. Andrews was not subject to conditions "so severe or

18   pervasive" as to alter his work environment. Mot. at 24. Mr. Andrews, in opposition, points to

19   evidence suggesting he witnessed and was himself subject to treatment that referenced race or

20   national origin, which included Ms. Zurbuchen's prohibition on speaking Spanish in which he

21   was fluent, calling plaintiff "slow," threatening him with termination similar to another group of

22   minorities that had been fired, and referring to his co-workers as the "Mexican Mafia." Rosa

23   Decl. ¶ 18; Andrews Dep. 49:5–8, 50:10–13. Mr. Andrews also points to the evidence reviewed

24   above suggesting he was treated differently from Caucasian co-workers whose job performance

25   was problematic.

26             On the record before the court no reasonable juror could conclude Mr. Andrews

27   was subjected to racial discrimination when being called "slow," without more. Mr. Andrews

28   /////

1   does not argue Ms. Zurbuchen referred to him as slow because of his race, and no precedent or

2   sister court suggests the word "slow" is a proxy for race.

3          On whether the prohibition on Mr. Andrew's ability to speak Spanish can support

4   a hostile environment claim, the Ninth Circuit has addressed bilingualism in the context of a Title

5   VII hostile environment claim. *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993).

6   The Ninth Circuit has observed that prohibitions on employees who speak both Spanish and

7   English are not so adverse as to amount to a hostile environment claim when bilingual speakers

8   wish to speak one language, such as Spanish, as a matter of "individual preference" rather than

9   necessity, as Title VII "does not protect the ability of workers to express their cultural heritage at

10  the workplace." *Id.* at 1486–87.

11         But the facts of *Garcia* are distinguishable from those here, for a reasonable juror

12  could find Mr. Andrews' decision to speak with monolingual members of his service crews was

13  made out of "necessity" rather than "individual preference," *id.*, because evidence of record

14  suggests other employees, including PRIDE managers and supervisors, could not effectively

15  communicate the tasks of the job to these crew members.  Andrews Decl. ¶ 6.  Under these

16  circumstances, a reasonable juror could find the prohibition on speaking Spanish in this case not

17  only interfered with Mr. Andrews' practical necessity to communicate, but also amounted to

18  racial discrimination against Mr. Andrews' monolingual Spanish speaking co-workers, which

19  itself in turn interfered with Mr. Andrews' "personal right to work in an environment unaffected

20  by racial discrimination." *Cf. id.* at 1488 (monolingual Spanish-speaking plaintiff could sustain

21  Title VII discrimination claim if she cannot enjoy the privilege of conversing on the job if

22  conversation is limited to a language she cannot speak); *see also Smithberg v. Merico*, Inc.,

23  575 F. Supp. 80, 83 (C.D. Cal. 1983) (White plaintiff could assert discrimination claim against

24  employer based on alleged practice of discrimination against African Americans; citing *United

25  States E.E.O.C. v. T.I.M.E.–D.C. Freight, Inc.*, 659 F.2d 690, 691–92 (5th Cir.1981)).  Similarly,

26  Mr. Andrews could sustain a hostile environment claim based on Ms. Zurbuchen's repeated

27  references to Mr. Andrews' co-workers as the "Mexican Mafia," for a juror could reasonably

28  /////

1   conclude this conduct also interfered with Mr. Andrews' "personal right to work in an

2   environment unaffected by racial discrimination." *Smithberg*, 575 F. Supp. at 83.

3         On balance, the prohibition on Mr. Andrews' ability to speak Spanish and Ms.

4   Zurbuchen's  repeated references to Mr. Andrews' co-workers as the "Mexican Mafia," when

5   combined with the threat of termination linked to previously terminated minority workers, could

6   support a hostile environment claim.  When considering the duration of the alleged discriminatory

7   conduct, Mr. Andrews testified he witnessed and was subject to this differential treatment from

8   February 2012 until the time he went on FMLA leave in May 2012.  Walters Decl. ¶¶ 28-29;

9   Andrews Dep. 227:14–228:18.  A reasonable jury might conclude Mr. Andrews was subjected to

10   repeated incidents of harassment based on race, whether directly or indirectly.  *El-Hakem*,

11   415 F.3d at 1073; *see also Smithberg*, 575 F. Supp. at 83.

12         Defendants' motion for summary judgment in this respect is DENIED.

13         5.    Failure to Prevent Race Discrimination

14         It also is an unlawful employment practice under FEHA "for an employer . . . to

15   fail to take all reasonable steps necessary to prevent discrimination and harassment from

16   occurring" in the workplace.  Cal. Gov't Code § 12940(k).  When a plaintiff seeks to recover

17   damages based on a claim of failure to prevent discrimination or harassment, he must show three

18   essential elements: (1) plaintiff was subjected to discrimination, harassment or retaliation;

19   (2) defendant failed to take all reasonable steps to prevent discrimination, harassment or

20   retaliation; and (3) this failure caused the plaintiff to suffer injury, damage, loss or harm.  *Achal v.*

21   *Gate Gourmet, Inc.*, 114 F. Supp. 3d 781, 804 (N.D. Cal. 2015) (interpreting FEHA).  Some

22   examples of "reasonable steps" available to remedy harassment or discrimination under FEHA

23   include "affirmatively raising the subject of harassment [or discrimination], expressing strong

24   disapproval, developing appropriate sanctions, informing employees of their right to raise and

25   how to raise the issue of harassment [or discrimination] under California law, and developing

26   methods to sensitize all concerned." *Id.*  Other reasonable steps include the establishment and

27   promulgation of antidiscrimination policies and the implementation of effective procedures to

28   handle discrimination-related complaints and grievances.  *Cal. Fair Emp't & Hous. Comm'n v.*

1  *Gemini Aluminum Corp.*, 122 Cal. App. 4th 1004, 1025 (2004).  The causation element requires

2  an employee to show the discriminatory conduct was a "substantial factor" in causing his harm.

3  *Alamo v. Practice Mgmt. Info. Corp.*, 219 Cal. App. 4th 466, 480 (2013).  Termination from

4  employment is an injury sufficient to support recovery under a failure to prevent discrimination

5  claim.  *See Gemini Aluminum Corp.*, 122 Cal. App. 4th at 1021.

6         Here, defendants argue Mr. Andrews' failure to prevent discrimination claim fails

7  because Mr. Andrews has not shown he suffered racial discrimination as a matter of law.  Mot. at

8  21–22.  But as noted above, the court has denied summary judgment to defendants on

9  Mr. Andrews' race discrimination claim.  Here as well, defendants have not borne their burden

10  and their motion is DENIED.

11                    6.        Wrongful Termination in Violation of Public Policy

12         As a matter of California common law, "when an employer's discharge of an

13  employee violates fundamental principles of public policy, the discharged employee may

14  maintain a tort action and recover damages traditionally available in such actions."  *Tameny v.*

15  *Atl. Richfield Co.*, 27 Cal. 3d 167, 170 (1980); *see also Freund v. Nycomed Amersham*, 347 F.3d

16  752, 758 (9th Cir. 2003).  The public policy implicated must be "(1) delineated in either

17  constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the

18  public' rather than serving merely the interests of the individual; (3) well established at the time

19  of discharge; and (4) substantial and fundamental."  *Freund*, 347 F.3d at 758 (quoting *City of*

20  *Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1159 (1998)).

21         The public policy implicated by Mr. Andrews' claim here is that articulated in

22  Labor Code section 1102.5, which prohibits employers from retaliating against an employee for

23  disclosing information to a government or law enforcement agency, where the employee has

24  reasonable cause to believe the information discloses a violation of state or federal statute.  Cal.

25  Lab. Code § 1102.5(b); *Cramer v. Consol. Freightways, Inc.*, 209 F.3d 1122, 1134 n.12 (9th Cir.

26  2000) (analyzing section 1102.5).  The purpose of section 1102.5 is to "encourage workplace

27  whistleblowers to report unlawful acts without fearing retaliation."  *Hollie v. Concentra Health*

28  /////

24

*Servs., Inc.*, No. 10–5197, 2012 WL 993522 at *5 (N.D. Cal. Mar. 23, 2012) (citing *Green v. Ralee Eng'g Co.*, 19 Cal. 4th 66, 77 (1998)).

Here, a reasonable juror could conclude one or more of Mr. Andrews' complaints to the National Labor Relations Board on June 17, 2012, Andrews Decl. Ex. B, the California Department of Pesticide Regulation on August 23, 2012, Andrews Dep. 169:15–16, 176:22–177:4, and the DFEH on June 25, 2012, Daniels Decl. Ex. B, amount to disclosure of a violation of a state or federal statute.  Cal. Lab. Code § 1102.5(b); *Cramer*, 209 F.3d at 1122.

Defendants argue Mr. Andrews' claim for wrongful termination in violation of public policy fails as "entirely derivative" of his FEHA claims.  Mot. at 22.  As noted, the court has denied summary judgment on Mr. Andrews' racial discrimination claim.  Defendants have not borne their burden, and their motion is DENIED.

7.    Summary

In sum, defendants' motion is DENIED on Mr. Andrews' state claims of racial discrimination, hostile work environment, failure to prevent discrimination, and wrongful termination in violation of public policy.  Defendants' motion is GRANTED on Mr. Andrews' state disability discrimination claims for failure to accommodate and failure to engage in the interactive process.  The court now proceeds to the merits of Mr. Andrews' federal claims.

C.    Federal Claims

1.    Race Discrimination in Violation of § 1981

In analyzing Mr. Andrews' race discrimination claim under § 1981, the court applies the same legal principles as in a Title VII disparate treatment case, akin to the burden-shifting framework governing FEHA race discrimination claims.  *See, e.g., Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 849-50 (9th Cir. 2004).  Once the plaintiff establishes a prima facie case of discrimination, defendant must then articulate a legitimate, nondiscriminatory reason for its conduct; if defendant surpasses this hurdle, plaintiff then may defeat summary judgment by showing defendant's reasons are pretextual.  *Id.*

Here, as noted in the FEHA race discrimination analysis above, a reasonable jury could conclude Mr. Andrews has established a prima facie case, defendants point to a "legitimate,

25

1   nondiscriminatory reason," but Mr. Andrews has undermined the veracity of that reason.

2   Accordingly, the evidence in the record may convince a reasonable juror that a discriminatory

3   reason more likely than not motivated PRIDE as the employer in the termination decision.

4           Defendants' motion on this claim is DENIED.

5           2.      Retaliation in Violation of § 1981

6           Defendants argue Mr. Andrews has not established a causal link between his

7   protected activity and his termination.  Mot. at 21–22.  Mr. Andrews contends the causal link

8   between his protected activity and his termination may be established by "the temporal sequence

9   between the protected expression and the adverse action."  Opp'n at 13.

10          As with plaintiff's § 1981and FEHA race discrimination claims, the court applies a

11  burden-shifting framework, where the plaintiff must first establish a prima facie case of

12  retaliation, the defendant must then articulate legitimate, nondiscriminatory reasons for its

13  allegedly retaliatory conduct, and the plaintiff must then show pretext.  *Fonseca*, 374 F.3d at 849-

14  50.

15          To make out a prima facie case of retaliation under § 1981, a plaintiff must

16  establish he undertook protected activity, his employer subjected him to an adverse employment

17  action, and there is a causal link between those two events.  *Vasquez*, 349 F.3d at 646.  To engage

18  in protected activity, the plaintiff must oppose an unlawful employment practice under § 1981.

19  *Learned v. City of Bellevue*, 860 F.2d 928, 932 (9th Cir. 1988) ("[T]he opposed conduct must

20  fairly fall within the protection of Title VII to sustain a claim of unlawful retaliation.").  An

21  adverse employment action is one that is "reasonably likely to deter employees from engaging in

22  protected activity."  *Vasquez*, 349 F.3d at 646.  Where the plaintiff seeks to establish causation

23  solely with evidence of close proximity, the adverse action must follow within a relatively short

24  time after the protected activity.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (per

25  curiam) ("The cases that accept mere temporal proximity between an employer's knowledge of

26  protected activity and an adverse employment action as sufficient evidence of causality to

27  establish a prima facie case uniformly hold that the temporal proximity must be very close.").

28  /////

1    Mr. Andrews contends he engaged in protected activity when he first took FMLA

2   leave on May 7, 2012, Andrews Dep. 227:14–228:18, filed a workers' compensation claim on

3   May 31, 2012, Andrews Decl. Ex. C, filed a complaint with the California Department of

4   Pesticide Regulation on August 23, 2012, Andrews Dep. 169:15–16, filed a claim with the NLRB

5   on June 17, 2012, Andrews Decl. Ex. B, and filed FEHA complaints with the DFEH on June 25,

6   2012 and February 4, 2014, Daniels Decl. ¶ 7.

7    Assuming these actions constitute "protected activity," and that the February 2014

8   filing counts in the analysis, the smallest temporal gap between Mr. Andrews' last protected

9   activity in February 2014 and his termination is 148 days, or approximately five months.  The

10  record includes no other evidence reasonably supporting a connection between Mr. Andrews'

11  protected activity and his termination.  Five months is not sufficient to show adverse action

12  followed "within a relatively short time."  *See Fisher v. San Pedro Peninsula Hosp.*,

13  214 Cal. App. 3d 590, 615 (1989)*; Jadwin v. Cty. of Kern*, 610 F. Supp. 2d 1129, 1156 (E.D. Cal.

14  2009) (five to six month gap in context of a section 1102.5 claim insufficient); *see also Breeden*,

15  532 U.S. at 273–74 (20-month period in Title VII case insufficient); *Cornwell v. Electra Cent.*

16  *Credit Union*, 439 F.3d 1018, 1034 (9th Cir. 2006) (8-month period in Title VII case

17  insufficient)*; Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997) (3-month period in

18  FMLA case insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–1175 (7th Cir. 1992)

19  (4-month period in Title VII retaliation case insufficient).

20    Mr. Andrews has not established there is a triable fact as to his § 1981 retaliation

21  claim, and defendants' motion for summary judgment on this claim is GRANTED.

22    3.    Interference with Exercise of FMLA Rights

23    Defendants contend Mr. Andrews' FMLA claims alleging retaliation and

24  discriminatory termination fail as a matter of law.  Mot. at 25.

25    a)    Anti-Termination and Anti-Retaliation Claims

26    Mr. Andrews alleges he was retaliated against and terminated in violation of the

27  FMLA.  SAC ¶¶ 139–159.  "In the Ninth Circuit, the anti-retaliation or anti-discrimination

28  provisions do not cover visiting negative consequences on an employee simply because he has

1   used FMLA leave." *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001).

2   Instead, the anti-termination and retaliation provisions apply to discrimination and retaliation

3   against an employee after that employee has opposed an employer's violation of the FMLA. *Id.*

4   Accordingly, where plaintiff alleges defendants terminated him based on the exercise of FMLA

5   rights, he has an interference claim under the FMLA. *Id.* Here, Mr. Andrews alleges only that

6   defendants retaliated against and terminated him because he exercised his right to take FMLA

7   leave, SAC ¶ 152, so the court construes his allegations as a single interference claim under the

8   FMLA, *Bachelder*, 259 F.3d at 1124.

9                               b)      <u>Interference Claim</u>

10          The FMLA prevents an employer from interfering with the employee's right to

11  take leave by refusing to authorize leave, discouraging the use of leave, or considering leave as a

12  negative factor in an employment action. *Liu v. Amway Corp.*, 347 F.3d 1125, 1132–33 (9th Cir.

13  2003). To prevail on an interference claim, the plaintiff must prove by a preponderance of the

14  evidence that the taking of FMLA-protected leave constituted a negative factor in the decision to

15  terminate him. *Bachelder*, 259 F.3d at 1125. The plaintiff can prove this claim by using either

16  direct or circumstantial evidence, or both. *Id.*

17          Here, there is evidence bearing on the employer's motives: PRIDE told

18  Mr. Andrews when it fired him that it based its decision on his inability to follow the directions of

19  the October 2, 2012 letter requiring that Mr. Andrews contact Andre Anthony by October 23,

20  2012 regarding his return to work. Walters Decl. Ex. M. Additionally, PRIDE contends it

21  terminated Mr. Andrews because of his disciplinary write-ups. *Id.* Ex. C. Mr. Andrews does not

22  point to any evidence suggesting his FMLA absence was considered a "negative factor" in the

23  firing decision. Further, after an independent review of the record, the court finds no evidence

24  suggesting the FMLA absence was considered a negative factor, or that PRIDE's reason for

25  terminating Mr. Andrews was mere pretext to camouflage any interference with Mr. Andrews'

26  FMLA rights. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.

27  2001) (the court is not required to "comb the record" to find some reason to deny summary

28  judgment). Construing the evidence in a light most favorable to Mr. Andrews, no reasonable

1    juror could conclude Mr. Andrews was terminated on account of his FMLA leave.  If anything,

2    PRIDE allowed a lengthy leave without expressing concern about the reason for the leave or its

3    length.  Defendants' motion on this claim is GRANTED.

4            4.      Summary

5            In sum, defendants' motion for summary judgment as to federal claims is DENIED

6    on Mr. Andrews' § 1981 race discrimination claim, GRANTED on his § 1981 retaliation claim,

7    and GRANTED on his FMLA retaliation and discrimination claims construed as an interference

8    claim.

9    VII.    CONCLUSION

10           For the foregoing reasons, the court DENIES defendants' motion for summary

11   judgment on the following claims: (1) FEHA race discrimination, (2) FEHA hostile environment,

12   (3) FEHA failure to prevent discrimination, (4) wrongful termination in violation of public policy

13   and (5) § 1981 race discrimination.  The court GRANTS defendants' motion for summary

14   judgment on the following claims: (1) disability discrimination in the form of failure to

15   accommodate, (2) disability discrimination in the form of failure to engage in interactive process,

16   (3) § 1981 retaliation, and (4) interference with FMLA rights.

17           This order resolves ECF No. 65 and SUPERSEDES the order filed at ECF No. 95,

18   which is VACATED.

19           IT IS SO ORDERED.

20    DATED:  January 11, 2017

21

22

23                                                    _____
                                                     UNITED STATES DISTRICT JUDGE

24

25

26

27

28

29