UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NAPOLEON ANDREWS,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>PRIDE INDUSTRIES, et al.,<br><br>　　　　　Defendants. | No. 2:14-cv-02154-KJM-AC<br><br><br><br>FINDINGS OF FACT |

This matter was referred to the undersigned by U.S. District Judge Kimberly J. Mueller for an evidentiary hearing to determine facts related to jurisdiction. ECF No. 118. The jurisdictional question is "whether the claims giving rise to this suit occurred on a federal enclave." See ECF No. 110 at 5.

**I. BACKGROUND**

Plaintiff, Napoleon Andrews, filed this employment discrimination and hostile work environment action against his former employer, PRIDE Industries, Inc. and supervisor, Jean Zurbuchen, in the Superior Court of Sonoma County on April 22, 2014. ECF No. 2. All claims arise from plaintiff's employment with PRIDE, a non-profit corporation that employs disabled individuals, as a grounds maintenance worker at Travis Air Force Base. On September 16, 2014, defendants removed the action to federal court on the basis of federal enclave jurisdiction. ECF No. 2.

1

On September 23, 2014, defendants moved to dismiss on grounds that all six of plaintiff's state law claims were barred by the federal enclave doctrine. ECF No. 6. Plaintiff contended in opposition that there was a significant question as to whether Travis Air Force Base is a federal enclave in its entirety, and that if the employment decisions on which plaintiff's claims are based arose outside the area designated as Travis AFB, this court lacks subject matter jurisdiction. ECF No. 12. The court denied defendants' motion to dismiss, without prejudice. ECF No. 18. Judge Mueller accepted that "the land designated officially as Travis Air Force Base qualifies for federal enclave status," but found that this did not resolve the jurisdictional question. Id. at 7:14-16. Because it appeared that some tracts of land at or around Travis may be subject to exclusive federal jurisdiction, while others may not be, Judge Mueller denied defendants' motion, ordered discovery limited to the jurisdictional issue, and granted plaintiff leave to amend the complaint. Id. at 10.

Following discovery and the filing of a Second Amended Complaint (ECF No. 25), defendants moved for summary judgment on April 8, 2016. ECF No. 65. Defendants again asserted, among other things, that plaintiff's state law claims were not viable because of the federal enclave doctrine. Id. The motion was granted in part on other grounds, and denied as to application of the federal enclave doctrine. ECF Nos. 95, 110.[1] On that issue, Judge Mueller found that neither party had presented new evidence despite full discovery, and that defendants' "mere recitation of their previously unsupported argument does not assist the court or make their case." ECF No. 95 at 12. On reconsideration, Judge Mueller corrected a single factual error in the original order,[2] but reaffirmed her previous finding that defendants had failed to establish the applicability of the federal enclave doctrine:

---

[1] Regarding plaintiff's substantive claims, Judge Mueller granted summary judgment to defendants on plaintiff's claims of disability discrimination in the forms of failure to accommodate and failure to engage in interactive process, § 1981 retaliation, and interference with FMLA rights. She denied summary judgment on plaintiff's claims for FEHA race discrimination, FEHA hostile environment, FEHA failure to prevent discrimination, wrongful termination, and § 1981 race discrimination. ECF No. 95.

[2] The initial order on summary judgment mistakenly stated that events giving rise to Mr. Andrews' claims had taken place at the David Grant Medical Center. See ECF No. 110 at 5.

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |

> Defendants have submitted no real evidence establishing one way or another where the events underlying this suit occurred, and accordingly, whether such events occurred on federal enclave land. At hearing, defense counsel conceded that his position was based solely on plaintiff's counsel recordation of the word "Admit" in response to defendants' first two undisputed facts. Given the totality of the record, the court is not prepared to resolve a critical legal question based on this bare appearance of an admission. Accordingly, the record supports the court's prior conclusion that the federal enclave question is unresolved. Defendants' motion in this respect is DENIED.

ECF No. 110 at 5.

The district judge ordered an evidentiary hearing to "determine whether the claims giving rise to this suit occurred on a federal enclave." ECF No. 110 at 5. That hearing was subsequently referred to the undersigned, ECF No. 118, and took place on August 22, 2017. ECF No. 128. The parties having filed their post-hearing briefs and proposed or stipulated findings of fact (ECF Nos. 137, 138, 140), the undersigned submits the following report and findings of fact.

## II. SCOPE OF REFERRAL

The federal enclave doctrine provides that only federal law applies on a federal enclave. See Paul v. United States, 371 U.S. 245, 263-64 (1963) (interpreting Art. I, § 8, cl. 17 of the U.S. Constitution[3]).[4] Defendants' invocation of this doctrine has twice been rejected by the district judge because it was unclear "where exactly at or around Travis the events underlying this action occurred and whether those locations are areas over which the United States has exclusive jurisdiction." ECF No. 18 at 8-9 (ordering discovery directed to federal enclave issue). Precision regarding location matters because military installations can be acquired for federal use on a tract-by-tract basis, and both the dates of acquisition and the status of jurisdiction may vary accordingly for different areas within a single base and its environs. See Paul, 371 U.S. at 269-

---

[3] This provision establishes exclusive federal legislative jurisdiction over "all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings." U.S. Const., Art. I, § 8, cl. 17.

[4] State law that pre-dates federal enclave status, if not inconsistent with federal policy, becomes federal law and is applicable as well. Id. Accordingly, conduct occurring on a federal enclave does not support causes of action under state law unless those causes of action predate the land's enclave status. See Snow v. Bechtel Construction, Inc., 647 F.Supp. 1514, 1521 (C.D. Cal. 1986).

3

70. As both the U.S. Supreme Court and the Ninth Circuit have indicated, application of the federal enclave doctrine requires particularized findings as to where the events at issue occurred and whether those specific tracts are areas over which the United States has exclusive jurisdiction. Id. (remanding for such findings in case about application of state price regulations to milk sold at California military installations); Willis v.Craig, 555 F.2d 724, 726 (9th Cir. 1977) (remanding for such findings in negligence case brought by civilian employee of Naval Weapons Station regarding on-the-job injury).

The evidentiary hearing ordered by Judge Mueller, and subsequently assigned to the undersigned, was intended to make the particularized factual findings required under Paul and Willis. ECF No. 110 at 5. The question of how the federal enclave doctrine applies to plaintiff's claims was not referred to the magistrate judge, and the undersigned has disregarded any legal arguments on that matter. To the extent that the relevance of any evidence proffered at the hearing was disputed by the parties on grounds related to the scope and proper application of the doctrine, the undersigned admitted the evidence subject to the district judge's ultimate determination of relevance.

### III. THE EVIDENTIARY HEARING

The evidentiary hearing was held on August 22, 2017. The transcript of proceedings ("Transcript") is found at ECF No. 132.

Plaintiff Napoleon Andrews testified about his employment with PRIDE at Travis AFB, and the physical locations where he performed his duties and where various events related to the case occurred.

Michael Buchanan was the grounds maintenance supervisor for PRIDE at Travis AFB during the period of plaintiff's employment. He testified about the locations of various buildings, landmarks, and work assignments.

James Frey testified as an expert witness, pursuant to the stipulation of the parties. Mr. Frey is an attorney who has spent his entire legal career (from 1982 to present) at the California State Lands Commission. The Commission is responsible, among other things, for effectuating and documenting transfers of the state's legislative jurisdiction over specific lands to the United

4

States (cession of jurisdiction) and returns of legislative jurisdiction by the United States to California (retrocession). As former Senior Staff Counsel for the Commission, now serving the Commission as a retired annuitant, Mr. Frey is an expert in determining the jurisdictional status of federal lands within the State of California.

The following exhibits were admitted into evidence: Plaintiff's Exhibits 1 and 5 through 19; Defendants' Exhibits A (including A-1 and A-2) and F through T. The two sets of exhibits are largely duplicative; citations below are to Defendants' Exhibits unless otherwise specified.

The enlarged map of Travis Air Force Base and its environs, the accuracy of which is stipulated, was marked both as Plaintiff's Exhibit 1 and Defendants' Exhibit A. Defendants' Exhibits A-1 and A-2 are transparent overlays to the map. All three witnesses referred to the map during their testimony, and Mr. Andrews and Mr. Buchanan marked various locations directly on the map. References below to "the Map," or to Defendants' Exhibit A, include A-1 and A-2 as marked by the witnesses. The underlying Map is divided into square Sections by a grid printed in red; the Sections are identified by number. For ease of reference, the court will use these Section numbers in its findings of fact regarding the location of events.[5]

## IV. FINDINGS OF FACT

### Background Jurisdictional Facts

The court fully credits the testimony and expert opinion of James Frey regarding the jurisdictional status of land comprising Travis Air Force Base. Mr. Frey's testimony was based on his personal and comprehensive review of property records, legislative history, and official communications between the United States and California governments regarding cession and retrocession of jurisdiction over lands at Travis. Mr. Frey is fully qualified to evaluate those materials and determine the status of the tracts at issue. Accordingly, based on Mr. Freys's testimony and the supporting exhibits,[6] the court finds as follows:

---

[5] The overlay marked in green indicates independently numbered "segments" identified by the Army Corps of Engineers, as well as discrete numbered "tracts." The tract identifications are relevant to Mr. Frey's historical research into jurisdictional status, but were not used in testimony regarding the location of events related to plaintiff's claims. Neither the tract designations nor the segment designations correlate with the Section designations.

[6] Defendants' Exhibits A through C, G through T; Plaintiff's Exhibits 1through 18.

5

1. A cession is a transfer of some or all of a state's legislative jurisdiction to the United States. Cession is effectuated and governed by state law, as state consent is required for the United States to obtain jurisdiction over property it acquires from the states.[7]
2. There are four categories of federal jurisdiction over property acquired from states:
    a. Where a state cedes exclusive jurisdiction to the United States, the state retains only the power to serve criminal and civil process. Transcript at 51:3-7.
    b. Where a state cedes partial legislative jurisdiction, the United State has all jurisdiction except that specifically reserved by the state. In California this is the most common form of cession, and California chooses to retain only the state's right to tax (in addition to the authority to serve process). Transcript at 51:21-52:5.
    c. Where a state cedes concurrent jurisdiction, it cedes all legislative jurisdiction to the United States and simultaneously reserves back the right to exercise the same

---

[7] As the U.S. Supreme Court explained in Paul:

> The power of the Federal Government to acquire land within a State by purchase or by condemnation without the consent of the State is well established. Kohl v. United States, 91 U.S. 367, 371. But without the States "consent" the United States does not obtain the benefits of Art. I, § 8, cl. 17, its possession being simply that of an ordinary proprietor. James v. Dravo Contracting Co., 302 U.S. 134, 141-142. In that event, however, it was held in Ft. Leavenworth R. Co. v. Lowe, 114 U.S. 525, 541, 542, that a State could complete the "exclusive" jurisdiction of the Federal Government over such an enclave by "a cession of legislative authority and political jurisdiction."

> Thus if the United States acquires with the "consent" of the state legislature land within the borders of that State by purchase or condemnation for any of the purposes mentioned in Art. I, § 8, cl. 17, or if the land is acquired without such consent and later the State gives its "consent," the jurisdiction of the Federal Government becomes "exclusive." Since 1940 Congress has required the United States to assent to the transfer of jurisdiction over the property, however it may be acquired. In either event -- whether the land is acquired by purchase or condemnation on the one hand or by cession on the other -- a State may condition its "consent" upon its retention of jurisdiction over the lands consistent with the federal use. James v. Dravo Contracting Co., supra, 146-149.

Paul, 371 U.S. at 264-65.

|   |   |
|---|---|
| 1 | jurisdiction.  In that case jurisdiction is co-extensive.  Transcript at 52:14-18.  In |
| 2 | California, cession of concurrent jurisdiction is limited by statute to concurrent |
| 3 | criminal jurisdiction.  Transcript at 53:5-13. |

       d.  Where the United States has proprietorial jurisdiction, it has none of the state's legislative jurisdiction.  California retains all of it.  In such cases the United States has proprietorial rights to use of the land, but the state has exclusive legislative jurisdiction.  Transcript at 51:3-7; 53:17-22.

3.  California statutes enacted in 1852 and 1872 ceded exclusive jurisdiction to the United States over lands it had purchased and used for military purposes pursuant to Article I, § 8, cl. 17 of the Constitution.  The state statutory scheme was modified in 1939 to reserve back to California the power to tax.  Accordingly, since 1939 the state has ceded at most partial legislative jurisdiction rather than exclusive legislative jurisdiction over such lands to the United States. Transcript at 57:4-9; Defendants' Exhibits J through N.

4.  Travis AFB ("Travis") was established in 1942 as the Fairfield-Suisun Army Air Field.  In 1942 and 1943 the United States acquired approximately 2,500 acres by purchase or condemnation.  Also in 1942 and 1943, California ceded partial legislative jurisdiction over these lands to the United States pursuant to California Government Code § 111, the cession statute in effect at that time.  Defendants' Exhibit S (Frey Decl.) at ¶¶ 4, 5.

5.  Pursuant to 40 U.S.C. § 255 (since repealed and recodified as 40 U.S.C. § 3112) a cession is only valid if affirmatively accepted by the United States.  Defendants' Exhibits O, P.  There is a conclusive presumption that California's cession was not accepted, and therefore is a nullity, unless the United States notified California of its acceptance of cession.  40 U.S.C. § 3112(c).  Two 1944 letters from the U.S. Secretary of War accepted California's cession of jurisdiction over lands previously acquired for military purposes, expressly including the Fairfield-Suisun Army Air Field.  A third letter, dated May 23, 1945, accepted California's cessions of jurisdiction over all lands previously acquired for military purposes within the state, title to which had already vested in the United States.  Defendants' Exhibit S (Frey Decl.) at ¶¶ 6, 7; Defendants' Exhibit T.  Accordingly, all

lands acquired for what is now Travis AFB from 1942 to May 23, 1945 are subject to partial federal legislative jurisdiction. Legislative jurisdiction over these tracts rests with the United States, with the sole exceptions of state taxation and service of process. Id.

6. In 1947, California Government Code § 111 was repealed and replaced by § 126, which is still in force. Defendants' Exhibits M, N. There is no record of any United States request for cession of legislative jurisdiction, or acceptance of such cession, regarding any lands at Travis under this statute. Accordingly, any tracts acquired by the United States for military use at Travis after May 23, 1945, are not subject to partial federal legislative jurisdiction. The United States has only proprietorial jurisdiction over such lands. Defendants' Exhibit S (Frey Decl.) at ¶¶ 9, 10.

7. In 1970, then-Governor Ronald Reagan accepted a retrocession (return of jurisdiction) over the lands embraced by an easement including Air Base Parkway, pursuant to California Streets and Highways Code § 77.5. Under the terms of the retrocession, partial legislative jurisdiction over the Air Base Parkway easement was returned to California, and proprietorial federal jurisdiction was established. Defendants' Exhibit S (Frey Decl.) at ¶ 8; Defendants' Exhibit T. The easement runs along the northern boundary of the partial jurisdiction area. Transcript at 83:11-12.

8. In sum, portions of Travis are under partial legislative jurisdiction in favor of the United States, and other portions are under proprietorial jurisdiction with California retaining all of its legislative jurisdiction. Transcript at 47:8-17.

9. The Map overlay marked in blue accurately identifies the boundaries of the areas on Travis that are under partial federal legislative jurisdiction. Blue hachure marks (diagonal lines) indicate the areas subject to partial legislative jurisdiction. Transcript at 72:22 - 73:25. Specifically, the hachure marks identify those tracts of land which were acquired by the United States through purchase in 1942 and 1943, cession of which was accepted by the United States in 1944 and 1945, and for which no retrocession was accomplished. See Transcript at 72:25-73:2.

10. A triangular area in the upper right (northeast) corner of the partial legislative jurisdiction area on the Map, in Sections 23 and 24, is separated from the remainder of the partial legislative jurisdiction area by a diagonal corridor of land that represents an old railroad right of way. This corridor was not acquired by the United States in 1942 or 1943 when the tracts on both sides of it were purchased. It was likely acquired after 1945, and there is no record of cession by California or acceptance of cession by the United States. Accordingly, the land within the corridor, which bisects an otherwise contiguous block of tracts subject to partial federal jurisdiction, is not itself subject to partial federal jurisdiction. It is under proprietorial jurisdiction. Transcript at 73:2-73:15; 82:2-7.

11. All lands within the perimeter of Travis AFB that lie outside of the blue hachured areas of the Map were later acquired by the United States under circumstances that do not establish partial federal jurisdiction. These areas are subject to proprietorial jurisdiction. Transcript at 47:12-17, 74:1-7.

12. The north half of Section 14 and the east half of Section 15 were acquired by the United States in the 1950s, and there is no record of any cession. Accordingly, these areas are under proprietorial jurisdiction. Transcript at 77:6-78:16.

13. All areas north of the Air Base Parkway/Travis Ave.[8] easement and within the perimeter of the Base, including those areas within Sections 13, 14 and 15, were acquired by the United States subsequent to the cessions previously described, and are therefore under proprietorial jurisdiction. See Transcript at 83:20-84:2.

**PRIDE Industries**

14. PRIDE Industries is a non-profit corporation that contracts with the United States to provide services including landscaping and grounds maintenance at Travis AFB.

---

[8] The western segment of the road that marks the northern boundary of the partial jurisdiction area is known as Air Base Parkway; its eastern segment is known as Travis Ave. Mr. Andrews sometimes referred to it as Travis Blvd. However denominated, the road marks the boundary between Sections 13 through 15, which lie to the north and are entirely subject to proprietorial jurisdiction, and Sections 22 through 27, which lie to the south and include all areas of Travis that are subject to partial legislative jurisdiction (as well as some areas subject to proprietorial jurisdiction).

15. PRIDE's headquarters is located in Roseville, California, outside of Travis AFB.

16. The "PRIDE Yard" at Travis is a designated location on the base, within the partial legislative jurisdiction area, which includes equipment storage, vehicle parking, and three trailers for PRIDE offices. The offices are used by the grounds, paint and custodial contract managers, and related Human Resources ("HR") staff. Andre Anthony (HR) and Jean Zurbuchen (contract manager for landscaping) had offices at the Yard during the period of plaintiff's employment. Transcript at 91:6-92:10.

17. Employee roll call is conducted at the Yard. Transcript at 93:5-7.

**Plaintiff's Employment at PRIDE and Location of Job Duties**

18. Plaintiff was employed by PRIDE Industries from May 2009 to November 19, 2012.

19. Plaintiff was hired as a grounds maintenance lead. He was responsible for performing landscaping and grounds maintenance duties at Travis, maintaining equipment, and supervising a crew of developmentally disabled workers.

20. Plaintiff's regular work duties involved locations in both partial legislative jurisdiction areas and proprietorial jurisdiction areas. Transcript at 121:18-142:23.

21. The locations where maintenance was to be performed were specified on printed seasonal schedules for the various grounds crews. See Plaintiff's Exhibit 19 (Winter Schedules, rev. 2/7/2012). Each day plaintiff followed written instructions similar to these. Transcript at 98:3-25.[9]

22. When plaintiff was assigned to the "Grounds 1" crew, the Monday schedule of winter (October through March) duties included areas to the north of Air Base Parkway/Travis

---

[9] Defense counsel attempted to impeach Mr. Andrews' credibility by questioning when he first saw the documents submitted as Plaintiff's Exhibit 19. At his deposition, plaintiff had testified that he had not previously seen the specific documents included in Exhibit 19. See Transcript at 155-156. The court finds Mr. Andrews' testimony at the evidentiary hearing to be generally credible. The illustrative grounds crew schedules, authenticity of which is undisputed, establish that maintenance employees during the period of plaintiff's employment were regularly assigned to work on parts of the Base within both partial legislative jurisdiction areas and proprietorial jurisdiction areas. Mr. Andrews was personally familiar with the areas listed on the schedules in Exhibit 19, and the court credits his testimony that he performed maintenance tasks in the identified areas on a regular basis and pursuant to written instructions.

10

Ave. in the vicinity of Cannon Drive. Transcript at 120:20-121:14. This location is in Section 14, which is under proprietorial jurisdiction.

23. Plaintiff's regular duties on Tuesdays included grounds maintenance around the 200 Buildings, including portions of the corridor which lies between but not within the hachured areas of the map and is therefore under proprietorial jurisdiction. Transcript at 121:25-122: 24.[10]

24. Plaintiff's Wednesday route included some locations north of Travis Ave., Transcript at 125:5-6, and therefore under proprietorial jurisdiction.

25. Plaintiff's Thursday duties included locations in the vicinity of the 200 Buildings, including portions of the proprietorial jurisdiction corridor. Transcript at 125:16-19.

26. Plaintiff's Friday duties were all within the partial legislative jurisdiction areas. Transcript at 126:10-11.

27. When he worked on the "Grounds 2" crew, plaintiff's duties were similarly geographically dispersed. His weekly duties included Monday maintenance around the Visitor's Center, which is within the Air Base Parkway easement. Transcript at 126:20-25. His Tuesday duties were entirely composed of locations north of Travis Ave. Transcript at 128:13-129:15. Mr. Andrews believed that some of his Grounds 2 duties on other days of the week were also outside the hachured areas indicating partial legislative jurisdiction, but he could not locate additional examples on the Map.

28. When Plaintiff worked on the "Grounds 3" crew, his Monday duties were all within the partial legislative jurisdiction areas and his Tuesday duties were all within proprietorial jurisdiction areas. Specifically, on Tuesdays he was responsible for maintenance of areas including the duck pond, North Gate, and areas around Burgan Blvd. between Collins Drive and Tunner Drive, Transcript at 133:15-134:10, which are within Sections 13 and

---

[10] Mr. Andrews frequently referred to the area of the old railroad corridor as an "easement." The only easement about which Mr. Frey testified is the easement encompassing Air Base Parkway, retrocession of which was accomplished in 1970. The court will refer to the proprietorial jurisdiction area in Sections 23 and 24, described above in ¶ 10, as the "proprietorial jurisdiction corridor."

11

14 of the Map. On Wednesdays plaintiff was responsible for proprietorial jurisdiction areas including the grounds of a base hotel and the field north of the CO Club parking lot. Transcript at 134:11-25. On Thursdays and Fridays he did work both within and outside the partial legislative jurisdiction areas. Transcript at 135:2-17.

29. When Plaintiff worked on the "Grounds 4" crew, his Monday duties were all within the partial legislative jurisdiction areas and his Tuesday duties were all within proprietorial jurisdiction areas. Transcript at 136:7-12. On Tuesdays plaintiff was responsible for maintenance of areas including Twin Peaks Drive, the Twin Peaks chapel, the Youth Center, Child Development Center, and areas near the northern perimeter of the base. Transcript at 136:11- 138:5. All these locations are within Sections 14 and 15. On Wednesdays, most of plaintiff's areas of responsibility were within partial legislative jurisdiction areas with the exception of the playing fields on Burgan Blvd., which are north of Travis Ave. Thursday duties incidentally included areas within the proprietorial jurisdiction corridor. Friday duties were within the partial legislative jurisdiction area except for the Twin Peaks ball field, which are to the north in the proprietorial jurisdiction area. Transcript at 138:21-139:14.

30. When Plaintiff worked on the "Grounds 5" crew, his Monday duties included Twin Peaks Island, the library, and the cinema, Transcript at 182:19-24, which are all north of Travis Ave. in Section 14, under proprietorial jurisdiction. On Tuesdays his areas of responsibility included the chapel and fitness center near the cinema, also in Section 14. On Wednesdays and Thursdays he performed maintenance around buildings both inside and outside of the partial legislative jurisdiction areas. On Fridays he worked exclusively within the partial legislative jurisdiction area. See Transcript at 143:3-144:19.

31. On occasion plaintiff was directed to perform additional tasks not listed on the schedules. These included grounds maintenance at the firing range out past the runways, around family housing at the north edge of the base (in Section 14), and in the vicinity of Center School (in Section 15). See Transcript at 144:4- 145:9. These areas are subject to proprietorial jurisdiction.

12

32. Plaintiff was regularly responsible for fueling PRIDE vehicles at the off-base Valero gas station. Transcript at 145:18-20.

33. Plaintiff attended an off-site staff meeting during working hours on at least one occasion. Transcript at 146:13-19.

34. When plaintiff was reassigned from a lead position to a detail position, his duties included the area north of Air Base Parkway/Travis Avenue in the vicinity of Twin Peaks and the Youth Center. Transcript at 147:12-16. These areas are under proprietorial jurisdiction.

**Specific alleged incidents of discrimination and/or harassment**

35. Plaintiff submitted a stress-related disability insurance claim, claiming a hostile work environment at PRIDE. In a letter to the EDD dated June 7, 2012, in support of this claim, Plaintiff identified six incidents that gave rise to his alleged disability. Defendants' Ex. F; see Transcript at 12:19-23, 33:2-13.[11]

36. First incident described in EDD letter: On February 16, 2012, plaintiff was spraying weed-killer near the Recreation Center Building when he was approached by an HR representative, Andre Anthony, who asked to speak with him. Plaintiff said that he felt ill and needed to excuse himself. He called his supervisor and said that he needed to leave work for the day because he was sick. The supervisor, Mike Buchanan, asked plaintiff to meet himself, Christi Pyle and Jean Zurbuchen at a dining area. Plaintiff did so. Plaintiff has identified the ensuing conversation, which included discussion of plaintiff's health and his job performance (and during which plaintiff alleges that he was mocked), as one of the events that gave rise to his disability. Defendants' Exhibit F, GKGJ000448-450.

37. The February 16, 2012 conversation between plaintiff and Andre Anthony occurred near the Recreation Center Building, which is within the partial legislative jurisdiction area. Transcript at 16:1-13.

38. The February 16, 2012 meeting between plaintiff and his supervisors took place in the

---

[11] The court makes no findings as to the substance of plaintiff's allegations or his credibility regarding the incidents he describes. The undersigned has identified the pertinent allegations and makes findings limited to the locations of the events alleged.

13

Sierra Dining Hall (Transcript at 165:19-166:1), which is in Section 13, in a proprietorial jurisdiction area.

39. <u>Second incident described in EDD letter</u>: Plaintiff alleges that on February 23, 2012, defendant Jean Zurbuchen approached him while he was in his truck and accosted him regarding a performance write-up. He alleged to EDD that the encounter involved "duress" and was a response to his assertion of his rights. Defendants' Exhibit F, GKGJ000450.

40. The February 23, 2012 incident began when while plaintiff was pumping gas into his company vehicle at an off-base gas station and he received repeated instructions via radio to return to base. The incident ended with an encounter with Ms. Zurbuchen and others in a parking lot on base. The parking lot serves several buildings including the thrift center, and lies within the proprietorial jurisdiction corridor. Transcript at 20:16-2, 21:1-13, 23:12-17, 51:4-14, 113:12-117:23.[12]

41. <u>Third incident described in EDD letter</u>: On April 27, 2012, plaintiff's supervisor Christi Pyle approached plaintiff while he was using a weed-trimmer to clear brush around propane tanks. Plaintiff identifies the initial conversation they had at this site, and a later conversation "back at the office," as one of the events that gave rise to his disability. Defendants' Exhibit F, GKGJ000451.

42. The initial April 27, 2012 contact between plaintiff and Ms. Pyle took place in a fenced-in area of approximately four-foot high brush near propane gas tanks, in a partial legislative jurisdiction area. Transcript at 89:25, 90:1-13. The trailer where plaintiff met with Ms. Pyle later in the day is at the PRIDE Yard, an area also subject to partial legislative jurisdiction.

43. <u>Fourth incident described in EDD letter</u>: Plaintiff alleges that his reassignment from a

---

[12] Mike Buchanan testified that the thrift center was at a different location, within the partial legislative jurisdiction area. Transcript at 90:15-91:5. Mr. Andrews explained that Buchanan had identified the former location of the "old thrift center," and that he was referring to the "new thrift center" (or "thrift shop") at a different location. Transcript at 149:19-150:17. The court finds Mr. Andrews explanation to be credible.

14

Grounds Lead position to a detail position, which he deems a demotion, was announced on April 30, 2012 during roll call in front of the entire team, without prior notice to him. Defendants' Exhibit F, GKGJ000451-452.

44. The April 30, 2012 roll call took place in the PRIDE Yard, which is subject to partial legislative jurisdiction. Transcript at 92:11-24, 93:5-7.

45. <u>Fifth incident described in EDD letter</u>: On May 1, 2012, plaintiff alleges that he was informed by Jean Zurbuchen that he would be in the detail position for one week, as a consequence for a "heated discussion" he had had with Christi Pyle. Defendants' Exhibit F, GKGJ000452.

46. The May 1, 2012 conversation took place in the office of Jean Zurbuchen, in a trailer at the PRIDE Yard, which is subject to partial legislative jurisdiction. Transcript at 27:15-22.

47. <u>Sixth incident described in EDD letter</u>: Plaintiff's letter to the EDD describes three encounters with his supervisors on May 4, 2012. First, Christi Pyle approached plaintiff during his first 15-minute break of the day, while he was sitting in his truck, and used up his break questioning him about his progress. Second, Christi Pyle, "Andre from HR," and Jean Zurbuchen approached plaintiff prior to his normally scheduled afternoon rest period to read him a memo and request a signature. Third, at the end of the day plaintiff returned to the office to discuss requested changes to the memo with Ms. Pyle. Transcript at 28:14-31:16; Defendants' Exhibit F, GKGJ000452-453.

48. The initial conversation with Christi Pyle on May 4, 2012 took place within the partial legislative jurisdiction area. Transcript at 167:22-24.

49. The second conversation on May 4, 2012 took place at the "general's quarters" near the intersection of First Street and Arnold Avenue, north of Air Base Parkway/Travis Ave. and in a proprietorial jurisdiction area. Transcript at 29:13-15.

50. The final conversation on May 4, 2012 took place at the office in the trailer at the PRIDE yard, which is within the partial jurisdiction area. Transcript at 31:3.

51. <u>Other incidents</u>: The complaint alleges that defendant Zurbuchen used profanity and

15

racially charged words on unspecified occasions when speaking to plaintiff, referred to racial stereotypes about African Americans, and "used the 'N' word in a discussion she held with plaintiff." ECF No. 25 (Second Amended Complaint) at 5, ¶¶ 30, 31. The alleged incident in which Ms. Zurbuchen used the "N word" in plaintiff's presence took place in the PRIDE trailer, which under partial legislative jurisdiction. Transcript at 37:19-38:2, 161:6-11.

52. On numerous occasions at roll call, which took place in the PRIDE Yard, Ms. Zurbuchen referred to Spanish-speaking workers as the "Mexican Mafia." Transcript at 40:16-22. Mr. Andrews, who is African-American, speaks fluent Spanish and had been reprimanded by Zurbuchen for speaking to other workers in Spanish. Transcript at 39:15-40:10, 43:21-23, 11:19-20. The latter conversation happened in the parking lot that is part of the PRIDE yard. Transcript at 43:21-23. Plaintiff went to Pamela Reed's office, which is in Roseville, to complain about the Spanish language prohibition and other things. Transcript at 111:22-112:9.

**Plaintiff's leave and termination**

53. Plaintiff's last day of work at Travis was May 4, 2012. He never again worked for PRIDE on the base. Transcript 10:11-13, 103:6-104:8.

54. Between May 4 and November 19, 2012, plaintiff communicated with Mary Jo Antle regarding his workers compensation claim. Ms. Antle's office is at PRIDE headquarters in Roseville. Transcript at 104:19-105:4.

55. Between May 4 and November 19, 2012, plaintiff communicated with Pamela Reed regarding his request for medical leave. Ms. Reed's office is at PRIDE headquarters, located off-base in Roseville, California. Transcript at 104:6-18.

56. After May 4, 2012, but before his termination on November 19, 2012, plaintiff filed a charge with the Department of Fair Employment and Housing and two complaints with the National Labor Relations Board. He also filed with California OSHA offices, and the Department of Pesticide Regulation and the County Agriculture Commission regarding

his latex glove allergy, and contacted the offices of Senator Diane Feinstein. Transcript at 168:5-19.

57. On November 19, 2012 plaintiff met with vice president of human resources Donna Walters at PRIDE headquarters in Roseville, California. Plaintiff went to drop off a note from his doctor, and to inquire about a letter he had sent asking for accommodations and the renewal of his pesticide license. Transcript at 105:15, 106:24-107:7.

58. Plaintiff received a termination letter from Donna Walters at PRIDE headquarters, dated November 19, 2012, around November 27, 2012. Transcript at 105:15-1067, 108:17-21.

## V. CONCLUSION

These findings of fact are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B). Within fourteen days after being served with these findings, any party may file written objections with the court and serve a copy on all parties. Id.; see also Local Rule 304(b). Such a document should be captioned "Objections to Magistrate Judge's Findings of Fact." Any response to the objections shall be filed with the court and served on all parties within fourteen days after service of the objections. Local Rule 304(d). Failure to file objections within the specified time may waive the right to appeal a District Court's order adopting these findings. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153, 1156-57 (9th Cir. 1991).

DATED: November 22, 2017

_____
ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE